**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
**--------------------------------------------------------X**
**UNITED STATES OF AMERICA,**

                                        **3:13-cr-00075 (RNC)**

           **v.**


**DAVID MILLER,**

              **Defendant.**
**--------------------------------------------------------X**




**DAVID MILLER'S SENTENCING MEMORANDUM**

                    Kenneth C. Murphy (ct29130)
                    SIMON & PARTNERS LLP
                    The French Building
                    551 Fifth Avenue
                    New York, NY 10176
                    (212) 332-8900

                    *Of Counsel*:
                              Bradley D. Simon
                              Brian D. Waller
                              Jonathan Stern
                              (Not admitted in Connecticut)


                    Attorneys for David Miller

Dated: November 8, 2013

# Contents

I.    PRELIMINARY STATEMENT ............................................................................. 1

II.    PERSONAL HISTORY ................................................................................... 2

   A.   Childhood and Family ............................................................................ 2

   B.   David's Work History and Life After College ....................................... 6

   C.   David's Financial Problems .................................................................. 10

   D.   The Apple Trade ................................................................................... 17

III.   THE GUIDELINES AND 18 U.S.C. § 3553 ............................................ 21

   A.   The Guidelines Calculation .................................................................. 22

     1.   The Court Should Depart Downward Under U.S.S.G. § 5K1.1 Because David Substantially Assisted the Government ................................. 24

     2.   The Court Should Depart Downward Under U.S.S.G. § 5K2.0(a)(1) .............. 25

       a)   Assistance to the Securities and Exchange Commission ........................... 25

       b)   The Cumulative Effect of Overlapping Enhancements ............................. 26

     3.   The Court Should Depart Downward Under U.S.S.G. § 2B1.1 Because the Total Offense Level Substantially Overstates the Seriousness of the Offense ....... 29

   B.   18 U.S.C.3553(a) ................................................................................ 30

     1.   The Nature and Circumstances of the Offense and the History and Characteristics of The Defendant (3553(a)(1)) ........................................... 32

       a)   The History and Characteristics of David Miller ....................................... 32

         (1)   David's Works of Charity and Kindness to Friends ............................... 33

         (2)   David's Dedication to His Mother and Brother ..................................... 36

         (3)   David's Conduct as a Husband and Father ............................................ 37

         (4)   David's Dedication to His Extended Family ......................................... 40

         (5)   David's Dedication to Kristen's Family ................................................ 42

       b)   The Nature and Circumstances of the Offense .......................................... 45

       c)   David Miller's Depression and Anxiety .................................................... 50

     2.   The General Purposes of Sentencing Will Be Satisfied By A Sentence Substantially Below the Advisory Guidelines Range (3553(a)(2)) ......................... 54

     3.   The Kinds of Sentences Available (3553(a)(3)) ................................................. 58

     4.   The Need To Avoid Unwarranted Sentencing Disparities Necessitates A Sentence Substantially Below the Advisory Guidelines Range 3553(a)(6) ............ 61

     5.   The Need For Restitution (3553(a)(7)) ............................................................. 66

IV.   CONCLUSION ............................................................................................ 66

## Cases

*Gall v. United States,* 552 U.S. 38 (2007) .................................................................. 22, 33

*Irizarry v. United States,* 553 U.S. 708 (2013) ...................................................................... 23

*Pepper v. United States,* 131 S. Ct. 1229 (2011) ................................................................... 33

*States v. Adelson*, 441 F .Supp. 2d 506 (S.D.N.Y. 2006), ................................................... 30

*United States v. Booker*, 125 S.Ct. 738 (2005) .............................................................. 21, 22

*United States v. Cavera,* 550 F.3d 180 (2d Cir. 2008)............................................................ 22

*United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005)............................................................ 21

*United States v. Emmenegger*, 329 F. Supp. 2d 416 (S.D.N.Y. 2004) ............................... 31

*United States v. Evan Brent Dooley*, 10-Cr-335-1 (N. Dist. Ill. filed April 27, 2010) ..... 63

*United States v. Frias*, 521 F.3d 229 (2nd Cir. 2008)............................................................. 67

*United States v. Gaind*, 829 F. Supp. 669, 669 (S.D.N.Y. 1993) ....................................... 58

*United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) ................................... 31, 59

*United States v. Jackson*, 346 F.3d 22 (2d Cir. 2003) ......................................................... 28

*United States v. John M. Rusnak*, 02-Cr-280 (Dist. Md. filed June 5, 2002) .................. 66

United States v. Kaye, 140 F.3d 86 (2d Cir. 1998)................................................................. 26

*United States v. Keller,* 539 F.3d 97 (2d Cir. 2008) ............................................................. 23

*United States v. Lauersen*, 348 F.3d 329 (2d Cir. 2003) ............................................... 27, 28

*United States v. Lauersen,* 362 F.3d 160 (2d Cir. 2004) ..................................... 27, 28, 29

*United States v. Matthew Taylor*, 13-Cr-251 (S.D.N.Y. filed March 28, 2013).............. 65

*United States v. Phillips*, 256 F. App'x 415 (2d Cir. 2007) .............................................. 27

*United States v. Pope*, 554 F.3d 240, 246-247 (2d Cir. 2009)........................................... 32

*United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) .......................................................... 22

*United States v. Savin*, No. S1 00 CR 45 (RWS), 2004 WL 1161323 (S.D.N.Y. May 25, 2004) ................................................................................................................................... 29

United States v. Stoffberg, 782 F. Supp. 17 (E.D.N.Y. 1992)......................................... 26

*United States v. Truman*, 304 F.3d 586 (6th Cir. 2002)....................................................... 26

*United States v. Willis*, 476 F.3d 103 (2d Cir. 2007)..................................................... 67, 68

## Statutes

18 U.S.C. § 1343..................................................................................................................... 1

18 U.S.C. § 3553............................................................................................................. passim

18 U.S.C. § 3662............................................................................................................. 34, 47

18 U.S.C. § 371....................................................................................................................... 1

18 U.S.C. §1343.................................................................................................................... 65

18 U.S.C.3553................................................................................................................. 26, 28

7 U.S.C. § 13(a)(5)............................................................................................................... 64

7 U.S.C. § 6a......................................................................................................................... 64

## Other Authorities

Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker,* 20 Fed. Sent. R. 167, 171 (Feb. 2008) ............................................................................... 29

## Rules

D. Conn. L. Cr. R. 32............................................................................................................ 24

U.S.S.G. § 2B1.1................................................................................................. 23, 24, 25, 31

U.S.S.G. § 3B1.1................................................................................................................... 68

U.S.S.G. § 3C1.1................................................................................................................... 68

U.S.S.G. § 5K1.1 ................................................................................................. 25, 26
U.S.S.G. § 5K2.0 ................................................................................................. 25, 26

# I.     <u>PRELIMINARY STATEMENT</u>

This memorandum is respectfully submitted on behalf of defendant David Miller ("David"), scheduled to be sentenced before this Court on November 19, 2013.  David pleaded guilty to one count of Conspiracy to Commit Securities Fraud and Wire Fraud, in violation of 18 U.S.C. § 371 and one count of Wire Fraud, in violation of 18 U.S.C. § 1343 on April 15, 2013.

Kevin Finnegan, a friend of David's and a detective with the Suffolk County Police Department, stated it simply: "Having investigated hundreds of felony cases over the years, I felt there was nothing that could surprise me.  That feeling changed the day I learned of David's involvement in the matter before Your Honor's court."  (Letter of Kevin Finnegan at p. 2, Ex 22).  David Miller, a married father of three young children, Kendall (12), Lindsay (10) and Matthew (3), committed an inexplicable fraud against his employer and a third party brokerage house on October 25, 2012.  As will be set forth more fully below, however, this act was a black stain on an otherwise admirable and praiseworthy life.  Other than his conduct while working at Rochdale Securities in October 2012, David has committed his life to acts of charity and kindness directed towards his family, his friends, his neighbors and even strangers.  David Miller is now, and always has been, a simple, quiet, understated and loving man.  He now stands before this Court something new: a broken man.

While we are in no way minimizing the seriousness of David's offense, his conduct was motivated by a sense of desperation while he suffered from anxiety and depression brought on by a confluence of unfortunate events that unfolded in his life over the last several years.  Witness after witness -- people who have known David his whole

life or only for a few years -- describe the shock and stunned disbelief they felt when they learned that David had committed a federal crime. Simply stated, his illegal conduct was inconsistent with his character. "There is, in the common sense of it ... a huge difference between a person who is essentially a grasping, evil, crooked, despicable human being and someone who is basically a good person but has made some intentional mistakes. And the notion, [is that] if our legal system ever ceases to recognize that distinction, we will have lost our own humanity. We will be a system without justice, without mercy, without feeling for the complexity of the human experience." *U.S. v. Whitman*, 12 Cr. 125 (JSR), 1/24/13 Sentencing Tr., at 27:25 - 28:8.

For these reasons, and because David provided substantial assistance to the United States Attorney's Office and cooperated with the Securities and Exchange Commission in their investigations, we respectfully request that the Court impose a sentence that is substantially below David's advisory Guidelines range.

## II.     __PERSONAL HISTORY__[1]

### A.     __Childhood and Family__

David's mother, Nora Petrone, gave birth to David and his older brother, John Miller, Jr., while still a teenager. (See PSR ¶ 40). Nora and David's father, John Miller, Sr., were married after she became pregnant with John Jr. at the age of 16, but the marriage was unstable and short lived.

David's father was physically abusive to his mother, unfaithful and neglectful. (PSR ¶ 40). He struck Nora from time to time. He fathered children with other women

---

[1] The facts set forth in this memorandum are gleaned from the Pre-Sentence Report ("PSR"), the letters submitted on David's behalf provided herewith (under separate cover) and conversations the undersigned has had with David and his family. Facts set forth herein not specifically stated in the PSR or in any letter to the Court have been reviewed and confirmed by David.

while he and Nora were married and he ignored his duties as a father and husband. (See PSR ¶ 40). The marriage finally ended one night when, as David recalls, his father failed to return home. That night, Nora's brother had been involved in a tragic motorcycle accident, but because her husband refused to return home to watch the children, she could not go to the hospital to see him before he died. (See PSR ¶ 40). That was Nora's last straw. Although divorce was still taboo in the mid-1970s -- especially for a devoutly Catholic family -- she divorced John Sr. and resolved to go it alone raising her two sons. As David has said, "[my mother's] life was the opposite of what I want for my two daughters. My mother raised me and my brother virtually by herself." (Letter of David Miller at p. 1, Ex 46).

Nora, John Jr., and David were forced to move into Nora's childhood home and live with her parents. Because Nora was the eighth child in a family of sixteen children (and still a teenager herself), the house was already filled to capacity. Nora and her mother were actually pregnant at the same time. (PSR ¶ 41). And while Nora's parents were able to take her in and give her family a place to live, not surprisingly, they were unable to assist financially. (PSR ¶ 41). Nora and the boys were unwanted guests in an overcrowded home. As Nora's sister, Frannie, describes it, "[David's grandfather] was no picnic either. While I do not think he ever beat David in the traditional sense, lashes with the 'belt' were common disciplinary fare and my father was certainly also verbally and emotionally abusive to David when David lived with him." (Letter of Fracesanne Li, p. 1, Ex 33).

Eventually Nora managed to make enough money to move the boys out of her parents' home. She rented an apartment using Section 8 housing vouchers. (PSR ¶ 41).

She then moved from job to job trying to improve their financial situation.  She went from working as a waitress to a court officer to a bookkeeper, each time making more money and improving their lives.  After school, while Nora was working, David and his brother would go to their grandparents' home to be supervised.  (PSR ¶ 41).  Nora later put herself through school, all in an effort to support her two growing children.  (Letter of Joseph Petrone at p. 2, Ex 61).  As David has described it, his mother did everything for him as a child; she was strong, dedicated, determined and a "fixer."  (PSR ¶ 43).

In contrast, David's father provided little to no support -- financially or emotionally -- to David or his brother.  (PSR ¶ 42).  His father was constantly behind on the child support payments and would do irresponsible things such as buy the boys a bicycle rather than provide Nora with the money she needed to pay the rent or food bills.  (PSR ¶ 42).  Although his father had visitation rights that permitted him to take his children on Sundays, he rarely showed up.  As David recalls it, his father picked him up once per month, and on those rare occasions, he simply dropped John and David off at his parents' home to be looked after by their grandparents rather than do so himself.  (PSR ¶ 43).[2]  As Frannie recalls: "When he was a boy, I distinctly recall that David would wait for his father to come to pick him up every Sunday.  David's father … would show up once out of every five or six Sundays.  He simply didn't care enough to make time for his children. After a few years, Dave's brother … gave up waiting for their father and went about his day, but not David.  That poor boy continued to wait for his father throughout

---

[2] Notably, David's paternal uncle, Michael Miller submitted a letter in support of David.  While Michael does not discuss his brother's shortcomings as a father, he does reveal that during David's childhood, David "spent a lot of time" at his paternal grandparents' house.   (Letter of Michael Miller, attached as Exhibit 49).

his teenage years and is still waiting for him to this day."  (Letter of Francesanne Li at p. 1-2, attached as Exhibit 33).

David attended grammar school and played Little League and whatever sports that his mother could afford for him.  Although he grew up in an affluent community in Long Island, he lived in small, overcrowded apartments and was from a single family home.  He did not share the financial stability of his classmates, neighbors and peers and longed as a child to provide for himself, his mother and his brother.

David was a hard worker and started earning money at a young age.  As his uncle puts it, David and his brother "became little men to compensate for what their father couldn't do for the family."  John and David "were well aware of the struggle" Nora faced and they "did the best they could to always carry their own weight."  (Letter of Joseph Petrone at p. 2, Ex 61).  At ten years of age, as his mother recounts it, David was already trying to earn money.  "It had snowed all night and there was no school - at 6:00 a.m. I found him out shoveling snow and knocking on the neighbors doors."  (Letter of Nora Petrone at p. 1, Ex 67).  By twelve years old, he was earning money washing cars and by fifteen, he had a job at the town recreation department.  "David was a worker.  He saved his money and bought all the things a teenager would want, from a racing bike to his first car."  (Letter of Nora Petrone at p. 3, Ex 67).

He was always a "soft spoken, kind and warm boy," who never gave his mother any trouble.  (See Letter of Teresa Delgado, Ex 12; Letter of Diedre Doherty, at p. 1, Ex 13).  He played several sports in high school including baseball, soccer and football.  He also, at one point, was on the track team.  David enjoyed watching professional baseball and, when he could, he would go to the games.  Nora states: "I only received

compliments about David; 'what a polite respectable teenager,' or 'how kind your son is'. One time a neighbor told me that her washing machine wasn't working and David, who was 14 yrs old at the time, was bringing her laundry to our home to wash it.  I didn't even know about it because he didn't share it with me."  (Letter of Nora Petrone at p. 2, Ex 67).

During high school, David met and began dating Kristen Mansfield, who would later become his wife.  (PSR ¶ 44).  After graduation from South Side High School in 1990, David attended Towson State University in Maryland. ("Towson.").  While at Towson, David and others started a chapter of the Delta Tau Delta fraternity where he was the founding Vice President.  (Letter of Paul Whitcomb at p. 1, Ex 85).  One of David's friends, Robert Wallace, DC, describes David in college as a "conscientious, hard working person" with a "very even keel" and "calm."  (Letter of Robert Wallace, DC at p. 1, Ex 83).  After David was at Towson for two years, Kristen transferred to the school so that they could spend more time together.  David graduated college in 1994 with a Bachelor of Arts degree, with a major in History and a minor in Business Administration. (PSR ¶ 52).

B.    David's Work History and Life After College

After David's graduation from college in 1994, David started his first job working at Gilford Securities where, as described by a former colleague, he had "probably the hardest job in the entire firm" working very hard and for a small salary "as a young retail trainee broker."  (Letter of John Best at p. 1, Ex 2).  He spent his weekends driving to Maryland to visit Kristen, who had not yet graduated.  Mr. Best also described David as unlike the type of person who was attracted to the glamorous side of Wall Street; there were no Hamptons' houses, expensive steak dinners or "crazy trips to exotic places."

Instead, he describes David as a "Subway sandwich type of guy." (Letter of John Best at p. 1, Ex 2).

Mr. Best ultimately became one of David's clients. Ironically, in light of David's current circumstances, he explains: "I always felt David approached any potential ethical conflict with the upmost integrity and care. There are many examples of him taking less commissions on potential trades in order to protect my firm's interest. This is a rarity on Wall Street and this is one of the main reasons why I am writing this letter." (Letter of John Best at p. 1, Ex 2)

David then moved to his next position at M.H. Myerson, a brokerage firm in Jersey City, New Jersey. (PSR ¶ 57). He commuted from his home on Long Island to work as an institutional sales trader, also referred to as just a "sales trader." This is the position he would hold for the rest of his career in finance. Sales traders are considered Wall Street's blue collar workers. They work at brokerage firms where analysts are employed. Sales traders are the people who provide to trading desks at other financial firms (hedge funds and mutual funds) the analysts' opinions on industry trends and stock performance before those opinions get out to the general public. If, based upon the research and insight that the institutional sales trader shares with his customer, the customer wants to buy or sell the stock, the institutional sales trader takes the order and executes it and earns a commission. (See Letter of David Miller at p. 2, Ex 46).

David left M.H. Myerson in 1997 and went to Needham and Company, an investment banking and asset management firm located in New York, New York. (PSR ¶ 57). One year later, in September 1998, David's brother had a tragic accident while working on a ship as a merchant mariner in Japan. As John explains, "I was flown to the

Trippler Army Medical Center in Hawaii. My brother immediately flew to Hawaii to be by my side. He stayed there until I was stable and on the road to recovery for two weeks." (Letter of John Miller at p. 2, Ex 47).

Two months later, on November 22, 1998, David and Kristen were married. (PSR ¶ 44). During this time period (the late 1990s) David's income steadily increased and he was doing well financially. His first daughter, Kendall, was born in November 2001. That was, as David describes it, the high point of his life. He was happily married, had purchased a home and was earning a good income. As he described it:

> In 2001, my future seemed bright. I was 29 years old, I had a child and I was earning a substantial $300,000. For a kid that grew up poor, I was proud of myself. My mother's life was not easy. She has always lived in an apartment, never owned her own home and has always struggled to make ends meet. So when I was in my late 20s and making money and able to buy a house, I was happy. I thought I had broken out of the cycle of struggle that I grew up in. I was optimistic about the future.

(Letter of David Miller at p. 1, Ex 46). It was right around this time, however, that the commission structure in the industry changed to a decimal system. As a result, the commissions went from fractions of a dollar (12 cents per share) to pennies on the dollar (two to five cents per share). In the beginning of his career, sales traders earned 1/8 of $1.00 or 12 cents for every share of an equity that they bought or sold for a client. In other words, if a client called and requested to sell 100,000 shares of Microsoft, the institutional sales trader would make approximately $12,500 for the purchase from the client and then another $12,500 when he sold it to the buyer. It had been a lucrative field. (*Id* at p. 2).

As a result of the change in the commission structure, the income of institutional sales traders industry-wide started to decrease. The consequence was to eradicate much of the sales trading industry and many of the jobs for those of who made their living in it. There were less and less traders needed to do the work. By way of example, David's "friend works at Citibank doing the same thing as [he] used to do (institutional sales trader). In 2003, there were 125 people in that position at Citibank, now, there are 5 people doing the work." (*Id.*)

In early 2003, David lost his job at Needham and Company. At that time, his wife was pregnant with his second daughter, Lindsay, who was born in September 2003 while he was unemployed and looking for a job. It took over one year for him to find employment. (*Id.* at p. 3). That time period was stressful, worrying about his small family, a wife who was not working and his future. As David explains:

> That was when the market was shrinking and the economy
> was in bad shape. At that time, my wife was pregnant with
> my second daughter. Lindsay was born in September 2003
> while I was unemployed and looking for a job. It took more
> than a year for me to find a new job, and although I had saved
> enough money to get through this period, I became haunted
> with the thought of my children living in poverty like I did as
> a child.

(Letter of David Miller at p. 3, Ex 46). But David always remained optimistic and hopeful about his future prospects. Up until that point, he had achieved the success he had hoped to encounter as a boy and assumed it would all work itself out. Unfortunately, however, each year after that, his expenses increase, but his earnings did not.

David got his next job at Punk Zeigel in 2004.[3] Another of David's former colleagues, an investment manager named Daniel V. DeClue, who met David while David was a trader there, describes how he used to purchase and sell securities through David. As Mr. DeClue explains, David's execution as a trader was skilled and, in the ten years they worked together, he found David to be trustworthy and someone who pursued the "oft-spoken but rarely followed maxim of 'putting the client first.'" (Letter of Daniel V. DeClue at p.1, Ex 11). He also described how stunned he was when he heard about David's offense. Mr. DeClue, like so many others, "is unable to reconcile in [his] mind the reality of [David's] actions with the man [he] knows." (Letter of Daniel V. DeClue at p.1, Ex 11). Erik W. Novotny, another co-worker who worked closely with David at Punk Ziegel describes David as having been "unapologetically loyal to his clients -- always working hard for them and keeping their best interests in mind." (Letter of Eric W. Novonty, attached as Ex 55).

By 2005, David's life was moving forward, although his salary was not what it was in previous years. At that time, David's debts were still under control. In fact, by 2005, he owed as little as $30,000 on his mortgage and had saved over $200,000. He was financially secure enough that he was even able to buy a new car for his mother.

C.     David's Financial Problems

In approximately 2006, David's income began to decline while simultaneously his financial obligations were increasing as a result of his growing family. To bridge the gap between his income and his expenses David started investing heavily in the stock market with his own money. This lead him to a disastrous investment in VaxGen, a San

---

[3] At some point while David was employed at Punk Ziegel, the firm was purchased by Ladenburg Thalmann Financial Services. (PSR at ¶ 55).

Francisco based biotechnology company that owned a patent to an anthrax vaccine.[4] David began to accumulate this position during 2005 and then into 2006. For example, during the months of January and February 2006, he acquired approximately 30,000 shares with a market value of roughly $533,000, about half of which was on margin. (Ex 89).

Due to accounting irregularities at VaxGen, however, the company was de-listed by NASDAQ. The ensuing stock collapse forced David to confront a margin call. Convinced that the simple revenue recognition problems would be cured, David covered the margin call with a mortgage for several hundred thousand dollars against his home. He firmly believed his actions would secure his family's future.

Not long after, the government unilaterally cancelled VaxGen's anthrax contract and the stock lost ninety percent of its value overnight. David and Kristen lost $1 million on paper that day sparking a downward spiral for David that continues to this day. In order to cover the margin call this time, David was forced to take a home equity line of credit for $280,000 against his home. This time, he had no choice. Over the course of approximately one year, David went from having almost full equity in his home -- worth approximately $400,000 -- to owing over $700,000 on the house.

In 2007, David was forced to sell most of his VaxGen stock. From 2007 to 2008, he also owned Citibank, Bear Sterns and Lehman Brothers stock, all of which plummeted in value. Thereafter, he encountered nothing but bad fortune with respect to his investments. A perfect example of his poor timing and decision making was his investment in Lehman Brothers ("Lehman"). Based upon the Ladenburg analyst's recommendation that the government would never let Lehman go under, David bought

---

[4] *See* http://en.wikipedia.org/wiki/VaxGen

$10,000 worth of stock in Lehman on Friday, September 13, 2008. The following Monday, September 15, 2008, Lehman filed for bankruptcy.

By the end of 2008, David knew it was time to leave Ladenburg (formerly Punk Ziegel). The institutional sales trading side of the firm was not doing well and his future prospects there were dwindling. However, it was very difficult to find employment elsewhere in the shrinking industry. By that time, he was thirty-six years old with only one skill set: institutional sales trading. In an effort to find new employment, David convinced the well-known bank analyst, Dick Bove, and his son, with whom he regularly worked at Ladenburg, that they should consider moving to another brokerage together. Mr. Bove told David he was interested in making such a move if David could find him a suitable firm. David identified Rochdale Securities in Stamford, Connecticut. In the beginning, Rochdale's principals informed David they intended to open an office in Long Island and that they would be interested in having David work from there while Mr. Bove and his son could work remotely from Florida. David handed the negotiations off to Mr. Bove's son, who was a research salesman, and who said he would work out the details. In the end, David was an afterthought. After the negotiations were settled with the Boves, the owner of Rochdale told David he could have a commission-based position in Connecticut. The Long Island opportunity closer to home was never to happen and David had no choice by then but to accept the offer. (See Letter of Kristen Miller, Ex 48).

By 2010, things had turned very bad for the Millers. David's salary had dropped significantly and his monthly obligations with the mortgage, home equity loan, increased property taxes and credit card bills were more than he could afford. He started to use

credit card cash advances to pay his mortgage.  He actually owed $300,000 more on the home than it was worth.  At the time, his wife was pregnant with their third child and he had a six year old and a nine year old at home.

To make matters worse, in June 2010, David received a notice from the IRS indicating that it was seeking back taxes in excess of $300,000 supposedly owed for gains in 2007, a year where David lost three times that amount.[5]  At first, he assumed it was a mistake that would quickly be corrected as he could not possibly have owed $300,000 since he didn't even earn that much in the year 2007.  David informed his accountant, who was a family friend, of the IRS notice.  The accountant assured David it was an error that would easily be taken care of.  The letters from the IRS, however, kept coming and with each notice the amount owed was growing with interest and penalties.  David called the accountant repeatedly.  Finally, the accountant assured David that he had scheduled an appointment with an IRS agent to straighten out the confusion.  At the eleventh hour, however, David's accountant canceled the meeting.  More and more letters were coming and the fine was growing.  David couldn't sleep at night.  (See Letter of Kristen Miller at p. 3, Ex 48).  The Millers had their third child, Matthew, in November 2010.

In February 2011, the IRS froze David's bank account at Nassau Financial Federal Credit Union and seized whatever money was in it.  Thereafter, the accountant promised David that he had another appointment to see the IRS.  This time, David called the IRS to confirm that the appointment was, in fact, scheduled.  But after the date for the appointment came and went, David did not hear back from his accountant.  David called

---

[5] The IRS was erroneously claiming he earned (not lost) $1,000,000 in 2007.  It was later discovered that the IRS reversed David's gains and losses on the return which is not an uncommon error.  However, it took more than two years to prove that the IRS was wrong.

the IRS directly to follow-up and was informed that his accountant failed to appear for the scheduled meeting. David interviewed other accountants but each of them wanted more money than he could afford to represent him.

By October 2011, David and Kristen could no longer afford to pay their mortgage. His income in 2011 had dropped to $92,000 and he was taking home about $2,800 semi-monthly. David's expenses far exceeded his take home pay. For example, at the time, his mortgage, home equity and property taxes alone were $4,000 and this didn't include commuting costs (which were $600 per month in gas and tolls) and the other costs of supporting a family of five. In addition, because he was using credit card advances to keep up with his debts, his monthly credit card payments were quickly becoming insurmountable.

By the end of 2011, David's youngest child was only a year old. Although the Millers needed the extra income that could have been generated if Kristen found employment, by that time she had been out of the work force for ten years and her job prospects were limited. In addition, whatever income she could have earned would have been spent on the costs of paying a babysitter to watch their children. Furthermore, for good or bad, as David has explained, he resisted encouraging his wife to go back to work because he did not want his children to suffer the same childhood that he had -- arriving home from school on a daily basis without their mother present. (See PSR ¶ 46).

In February 2012, a warrant was issued by the Commissioner of Taxation and Finance of the State of New York (the "New York Taxing Authorities") in the amount of $62,186.36. By March 1, 2012, David was informed by a Warrant Officer that they were going to garnish $1000 of his weekly pay. By March 17, 2012, he received an income

execution and, on March 18, 2012, David wrote a desperate letter to the New York State

Office of the Taxpayer Rights Advocate where he pleaded for help:

> I am facing threat of immediate adverse action (seizure of payroll in an amount greater than my net payroll) for a debt I <u>know</u> is not owed, and the action is unwarranted.
>
> I am married with three (3) children; I am currently behind 4 months on my mortgage and am currently in negotiations with the bank, and in 2007, I lost over $800,000 (everything I owned) in the stock market. My employment is in jeopardy due to the Frank Dodd Bill [sic], I am currently working in Connecticut, 50 miles from my home.
>
> The garnishment stems from my 2007 Tax Return I am currently waiting for a final determination from the IRS. The ultimate problem with the 2007 relates to the cost basis of stock trades. The stock trades in question were marked by the IRS as a cost basis of **<u>ZERO IN ERROR</u>**, I have supporting documentation to prove the cost basis (which was attached on my initial 2007 return)....
>
> ...I spoke with Ms. Abey, Thursday March 1, 2012; Ms. Abey stated that I would have to send approximately $1000 dollars [sic] a week, which I am unable to pay. Then on March 17, 2012, I received another Warrant for Garnishment of my pay.
>
> Continually throughout the past 3 years, my accountant assured me that he was handling this matters and that it would be resolved.
>
> At this point, I am at risk of loosing [sic] my income, home and will be unable to support my family, I respectfully request immediate assistance in resolving this matter.

(DTF-911, Request for Assistance form the Office of the Taxpayer Rights Advocate at p.

3, attached as Ex 90) (emphasis in original).

David finally went to his mother and asked for her assistance. (She is a CPA,

although she does business taxes rather than personal returns). While it pained David to

reveal how his financial situation had deteriorated so badly, as always, she was there for

him.  Together they went to the IRS and eventually straightened it out.  In the end, his taxes were correct and the IRS owed David money and not the other way around.

On top of the IRS issues, David was having problems with his neighborhood.  The Millers live in a small, three bedroom home on the border between the towns of Rockville Centre and Oceanside in Nassau County, New York.  David and his wife, Kristen, each grew up in Rockville Centre.  In fact, both of David's parents and their respective families grew up there.  Unfortunately, the street where David bought his home, which borders a commercial district, has seen a rapid decline in the past few years.  Most significantly, three of the homes adjacent to his were turned into rentals and have been rented under the Section 8 program.  Ironically, since Section 8 allowed Nora the opportunity to leave her parents' home, David is a direct beneficiary of that federally funded program.  Nevertheless, this led to genuine difficulties for David and Kristen.  As David's mother explained it:

> From 2007 on his neighborhood was changing, 2 multi-family homes on one side of his home turned into 3 family Section 8 housing, along with the home directly behind him. There were cars double-parked with music blasting, people and kids running around at all hours of the night. The neighbor's kids would take toys out of David's backyard. David's driveway is right next to the neighbors and the adults were constantly smoking pot in their driveway. David and Kristen were constantly on the phone with the police, 3 – 4 times a week.  I can attest to the noise, pot smoking and kids running around, 4 or 5 cars in the driveway with the loud music playing.  I was at David's house many times and saw what was going on.

(Letter of Nora Petrone, Ex 67).  As David's brother John explains, there was even a shooting close to David's home.  "The increase in crime and fear for the safety of his family has weighed heavily on him.  We discussed this on many occasions.  I can tell you

that I believe he was severely depressed himself and desperate to remove his family from the area he was in."  (Letter of John Miller, Ex 47).

    D.    <u>The Apple Trade</u>

        David had a customer at the proprietary trading firm Quad capital named Harlan Sender.  David developed a relationship with Sender after meeting him a few years earlier.  The two regularly exchanged instant messages ("IM") regarding stock information.  They also became personal friends (or so David thought).  Sender gave David small orders from time to time and David would take Sender out for drinks a few times a year. The two regularly talked about the markets, their respective financial situations, their professional circumstances, their family and personal problems and all sorts of subjects.  Their conversations occurred both on the phone and by IM.  David shared with Sender his personal problems with his employer at Rochdale; specifically, the fact that he was not getting his commission payments as promised and that his employer was not giving him any new accounts.  He also discussed with Sender how his income had dropped substantially in recent years and that his past miscalculation with the VaxGen stock had lead to the loans against the house and, later, the IRS and NY State Taxing Authorities seizure and collection efforts.  Sender was intimately aware of David's financial situation and personal problems.

        At some time in late 2011, Sender and David were out by Sender's office in Manhattan for drinks when Sender mentioned in passing something to the effect of, "Apple is an amazing stock, did you see the last earnings call?  It was up huge after they beat the estimate.  Wouldn't it be great if I was long a million shares?  I would be rich in

an instant." At the time, David did not think much of it. It was just one trader talking to another about a theoretical play.

A few months later, on March 27, 2012 -- about two weeks after the New York State $1,000 per week wage garnishment notice -- David met Sender out again for drinks at the same location they always met near Sender's office. Again, Sender started talking about Apple and how it was so volatile that the stock would swing $20 to $30 a share either way after it announced its quarterly earnings (up or down depending on estimates and how it did). This time, however, Sender also showed David charts and data that revealed how the stock reacted. Then, Sender said to David: "What if I gave you an order and you acted like it was a mistake and bought 1000 times what I ordered?" At first, David was shocked by the proposal. No one had ever proposed to him an illegal plan such as that before. While David was shocked by the brazen proposal, he did not say whether he would or would not do it. David just sat and listened to Sender's pitch. After this conversation, Sender started to send David different analysts' reports on Apple earnings and other issues related to the Apple stock by IM or email.

One month later, in April 2012, David could not stop thinking about Sender's proposal and how, if it worked, all the stresses of his life -- the under-water house, the IRS notices, the credit card statements and collection notices, the three hour per day commute -- would be behind him in one day. He watched the Apple April earnings report with anticipation and noticed that the stock rose by $55 just as Sender had predicted. At that point, he still had not made a decision to do it, but he was seriously considering it.

A few weeks or months later (the date is not clear) Sender and David met again at the same bar in New York City and made small talk. Again, Sender brought up Apple. He pulled David away from the bar to a small area in private and showed David additional reports that revealed what Apple had done after earnings per share were announced in previous quarters. He explained to David how his research indicated that between 80-87% of the time Sender's predictions on how Apple stock would move after the earnings were reported (i.e. up or down) had been correct. Sender also discussed again how the two could say it was an error and a miscommunication regarding how much to purchase, if the trade did not work as Sender predicted. David agreed to do it at that meeting.

Leading up to the July 24, 2012 earnings announcement, Sender started sending David emails regarding analyst reports or Apple that supported Sender's Apple theory that quarter. On the morning of the anticipated July 24 trade, Sender sent an email to David which, in the subject line, stated: "This may present a problem." (Exhibit 2). The body of that email is an internal Quad Capital email sent to Quad's employees that discusses the fact that an examiner was to be on the premises at Quad on July 24 and July 25, 2012. The email requested all Quad's employees to be on their best behavior. This was not a blast email sent to all of Sender's mailing list but, instead, an email sent specifically by Sender to David alone.

At approximately 12:05 p.m., Sender sent an instant message to David directing him to short the stock. The message read: "sell 125 per half an hour - aapl." (Information, Dkt. No. 17 ¶10). Although he had previously agreed to partake in the

scheme, David found himself panicked and so nervous that he went into the bathroom at Rochdale and vomited. He ultimately got cold feet and did not do the trade.

Sender was correct about the July 24 earnings report and how the stock would react. After the earnings announcement, the Apple stock dropped as much as $30 per share. Had David followed through with Sender's scheme that time, it would have netted approximately a $30 million profit (from which David would have received a presumably large payout at Sender's discretion).

Several weeks later, Sender invited David to meet for a drink. David was afraid to even face Sender after he failed to deliver on their scheme. They met at the same bar where they had on previous occasions. Although David was nervous, to his surprise, Sender was warm and understanding. David was relieved when Sender put his arm around David's shoulder and said, "see, I told you it would have worked, don't worry about it, there is always a next time." The two discussed the trade and Sender again highlighted that his theory was correct as proven by the July numbers. David agreed to try again. This time they decided that the cover story would be that Sender would write an "125 ok" after the order, which David would misread as "125k" or 125,000 per half hour. (See Information at ¶ 10).

There was never any agreement between Sender and David regarding how the profits would be split. In David's mind, whatever Sender was willing to give him, he would have accepted. Based on where his life was at the time, as David has described it, anything was better than what he had, which, as he saw it, was nothing. At that meeting, Sender also told David that he must send a confirmation to Sender after the shares were purchased. David promised Sender that he would do so.

In the week leading up to the October 25 earnings announcement, David decided to hedge Sender's plan with a smaller short strategy by attempting to sell the stock short through another firm, Saratoga Capital LLC ('Saratoga").  Even though he believed Sender's plan was 80-87% likely to work (as had been showed to him by Sender) if, by some chance, Sender was wrong, David at the very least would have been out of a job. He believed that if the stock dropped, he could hedge the trade with the short position. Of course, in retrospect, this plan was monumentally flawed.  Once he lied to Saratoga and set up the short position, any defense that he had made a "mistake" on the long trade was wholly unbelievable and destined to fail.  (PSR ¶ 12).

In one day, David executed the trades, left the office and listened to the news on the radio in a panicked state, anxiously waiting to hear the Apple earnings announcement. When he heard the stock had dropped, contrary to Sender's prediction, he was terrified. He knew it was all over and he sat in his car and cried.  In the matter of a few hours, his whole life changed.  On Tuesday, November 13, 2012, the undersigned was contacted by Assistant United States Attorney Paul Murphy.  Two days later, David confessed.

III.     **THE GUIDELINES AND 18 U.S.C. § 3553**

In the wake of *United States v. Booker*, 125 S.Ct. 738 (2005), the Second Circuit in *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), set forth guidance instructing this court how to proceed to sentence.  The Honorable Judge Newman explained that although the Guidelines are no longer mandatory, sentencing judges must still "consider" the guidelines along with the factors listed in 18 U.S.C. § 3553(a) (hereafter "3553(a)"). However, since *Booker* and *Gall v. United States,* 552 U.S. 38 (2007), it is now clear that "[a] district court *may not presume that a Guidelines sentence is reasonable,* it must

instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense. District judges are, as a result, generally free to impose sentences outside the recommended range." *United States v. Cavera,* 550 F.3d 180, 189 (2d Cir. 2008) (*en* banc) (footnote omitted, emphasis added). Moreover, the Court *must* consider all of the sentencing factors enumerated in 3553(a) and "make an individualized assessment based on the facts presented." *Gall v. United States,* 552 U.S. 38, 50 (2007); *see also United States v. Rigas*, 583 F.3d 108, 116 (2d Cir. 2009) ("a District Court must make an individualized assessment based on all of the sentencing factors in § 3553(a)").

While it may be a distinction without much of a difference, there is, in fact, a distinction between a sentence that results in a variance from the Guidelines based upon the Court's consideration of all the 3553 factors, and a sentence that is applied below the Guidelines as a result of certain downward departures found within the Guidelines. *See, Irizarry v. United States,* 553 U.S. 708, 709 (2013); *see also Pepper v. United States*, 131 S. Ct. 1229, 1247 (2011); *United States v. Keller,* 539 F.3d 97, 100 (2d Cir. 2008). For the reasons set forth below, David's circumstances justify a significant variance based upon the 3553(a) factors *and also* a substantial downward departure based upon several relevant departure grounds provided in the Guidelines.

A.     The Guidelines Calculation

According to the PSR, David's Guidelines calculation results in a total offense level of 32. David objects to this calculation in two respects. First, the PSR applies a 20 level enhancement for a loss amount of more that $7 million but less than $20 million. § 2B1.1(b)(1)(K). Such a loss figure was not agreed to in the  plea agreement and we

expressly reserved the right to challenge any alleged loss amount above $5.2 million.  By its letter dated October 22, 2013, the Government indicated that it requested several times from Rochdale's counsel additional support for the loss numbers relating to the value of the collateral and the value of the business but that Rochdale has advised that, "because of other ongoing litigation and arbitration matters, it will not be submitting any further information on this topic.:  (Letter of AUSA Paul Murphy, dated October 22, 2013 at p. 1, (Dkt. Entry 45-4).  The Government, therefore, has based its conclusion that the losses exceeded $7 million entirely upon unsupported oral representations by Rochdale without any supporting data.  Thus, the Government's conclusion is not sufficient for this court to impute to David a loss of $7 million or higher.[6]  Any loss calculation must be supported by a preponderance of the evidence, *United States v. Venkataram*, 356 Fed. Appx. 541, 543 (2d Cir. 2009), and absent documentation, the Government cannot meet this burden.

Second, as also noted in the PSR, the level 32 Guideline calculation included a four level enhancement that was not contemplated in the Plea Agreement pursuant to § 2B1.1(b)(15)(B)(i) (an offense that substantially jeopardized the safety and security of a financial institution).  Because that enhancement was not contemplated in the negotiations leading up to the plea agreement or in the final version executed, it should not be included in the Guidelines calculation now.  *U.S. v. Fernandez*, 877 F.2d 1138, 1145 (2d Cir. 1989).

---

[6] While the undersigned understands that this issue should have been brought up in objections to the PSR pursuant to District of Connecticut Local Rule of Criminal Procedure 32(a), conversations prior to the filing of the October 18 objections to the PSR with the Government lead the undersigned to believe that Rochdale would be submitting supporting data..  However, on October 22, 2013,it became clear for the first time that no such data would be forthcoming.  For this reason, we bring this issue up now in the Sentencing Memorandum rather than in the October 18, 2013 Objections to the PSR.  This Court has the power to permit an untimely objection at any time prior to the imposition of sentence for "good cause."  D. Conn. L. Cr. R. 32(d).

Without the four-point § 2B1.1(b)(15)(B)(i) enhancement, and assuming a loss amount between $2.5 million and $7 million, § 2B1.1(b)(1)(J), David's applicable offense level should be 26 with an imprisonment range of 63 to 78 months.

Furthermore, a downward departure from the resulting Guidelines range is warranted on three separate grounds: first, under U.S.S.G. § 5K1.1 because the Government has moved for a downward departure based on David's substantial assistance; second, under U.S.S.G. § 5K2.0(a)(1) because of circumstances not contemplated by the Guidelines, specifically, the cumulative effects of certain enhancements and also because of the assistance David rendered to the Securities and Exchange Commission ("SEC"); and, finally (3) under U.S.S.G. § 2B1.1 (App. Note 19), because the total offense level overstates the seriousness of the offense.

### 1. The Court Should Depart Downward Under U.S.S.G. § 5K1.1 Because David Substantially Assisted the Government

Pursuant to U.S.S.G. § 5K1.1, a significant downward departure from David's current Guidelines calculation is appropriate. The basis for this is set forth in the letter of AUSA Paul Murphy. His cooperation included among other things multiple proffers, providing emails and cell phone records to the Government confirming the involvement of the co-conspirator and an attempted meeting to while wearing a recording device.[7]

---

[7] As of the time of this writing, the undersigned had not seen the 5K1 letter but did anticipate that it would be filed prior to sentencing.

**2.     The Court Should Depart Downward Under U.S.S.G. § 5K2.0(a)(1)**

a)     <u>Assistance to the Securities and Exchange Commission</u>

U.S.S.G. § 5K2.0(a)(1) and 18 U.S.C.3553(b) also explicitly authorizes

sentencing courts to depart downward from the otherwise applicable Guidelines range

based upon a mitigating circumstance "of a kind and degree, not adequately taken into

consideration by the Sentencing Commission."

Separate and distinct from a Government motion  under § 5K1.1, courts have held

that a departure for assistance under § 5K2.0 is permissible where a defendant provided

assistance to branches of government other than those that engage in federal prosecutorial

activities even though the assistance did not involve the investigation or prosecution of

one who had committed a federal criminal offense.  *See, e.g., United States v. Truman*,

304 F.3d 586, 591 (6th Cir. 2002) (departure under § 5K2.0 is warranted where

defendant's cooperation helped government and victim identify and fix security flaws);

*United States v. Kaye*, 140 F.3d 86, 88-89 (2d Cir. 1998) (defendant's cooperation with

state law enforcement authorities in a drug trafficking case was not grounds for a

downward departure under § 5K1.1, but rather was proper grounds for a downward

departure under 5K2.0); *United States v. Garcia*, 926 F.2d 125, 128 (2d Cir. 1991)

(defendant's assistance to the court system in general, and not law enforcement in

particular, merited downward departure pursuant to Section 5k2.0).  *United States v.*

*Khan*, 920 F.2d 1100, 1106 (2d Cir. 1990) (§ 5K2.0 departure could be considered where

defendant assisted in rescuing a confidential DEA informant kidnapped by foreign drug

dealers); *United States v. Stoffberg*, 782 F. Supp. 17, 19 (E.D.N.Y. 1992) (departure

could be considered under § 5K2.0 where defendant provided assistance to a congressional committee).

As set forth in the letter submitted by the Securities and Exchange Commission, dated November 6, 2013, David assisted the SEC in its current investigation of his offenses and other unrelated matters with which he had no involvement.

### b) The Cumulative Effect of Overlapping Enhancements

The Second Circuit has held that a § 5K2.0 downward departure under the Guidelines is appropriate "when the addition of substantially overlapping enhancements results in a significant increase in the sentencing range minimum (as it does in the higher end of the sentencing table)." *United States v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004) ("*Lauersen II*"), *vacated and remanded* for further consideration in light of *Booker*, 543 U.S. 1097 (2005).[8] In this case, the PSR enhancements stack up so quickly that they justify a "cumulative effects" downward departure.

In *Lauersen II,* the Second Circuit, on consolidated rehearing, reaffirmed two of its prior decisions that had deemed a downward departure appropriate. In *United States v. Lauersen*, 348 F.3d 329 (2d Cir. 2003) ("*Lauersen I*"), *vacated and remanded* for further consideration in light of *Booker,* 543 U.S. 1097 (2005), the Second Circuit had held that a four-level enhancement substantially overlapped with a 13-level loss enhancement, and that the extreme impact of these cumulative enhancements at the high end of the sentencing table "might well justify a downward departure." *Id.* at 343-344

---

[8] Although *Lauersen II* was vacated and remanded for reconsideration in light of *Booker*, 543 U.S. 1044 (2005), the Second Circuit has continued, after *Booker*, to consider the cumulative effects of substantially overlapping enhancements as a available ground for departure. *See United States v. Phillips*, 256 F. App'x 415, 417 (2d Cir. 2007) (considering *Lauersen* departure argument but affirming district court's discretionary denial on the facts).

(*quoting* 18 U.S.C.3553 (b)(1)).  Similarly, in *United States v. Jackson*, 346 F.3d 22 (2d

Cir. 2003), *vacated,* 543 U.S. 1097 (2005), *cert. denied,* 129 S. Ct. 516 (2008), the

Second Circuit had held that enhancements for loss, more than minimal planning,

sophisticated means and leadership role in a bank fraud scheme substantially overlapped

and warranted a downward departure.  The court had observed that "[m]ost fraud

schemes that obtain more than one half million dollars involve careful planning, some

sophisticated techniques, and are extensive."  *Jackson*, 346 F.3d at 26.

The Second Circuit in *Lauersen II* reiterated its concern that the structure of the

Sentencing Guidelines causes an enhancement to have a significantly larger impact on

defendants at the higher end of the sentencing table.  The court observed that "[f]or

example, in Criminal History Category I, a 4-level enhancement added at offense level 17

increases the sentencing range minimum by 13 months; at offense level 27, by 38

months; and at offense level 37, by 114 months."  *Lauersen II,* 362 F.3d at 163.

> when the addition of *substantially overlapping enhancements*
> results in a significant increase in the sentencing range
> minimum (as it does at the higher end of the sentencing table),
> a departure may be considered. What is present to a degree not
> adequately considered by the Commission is the *combined
> effect* of the aggregation of substantially overlapping
> enhancements and the large increase in the sentencing range
> minimum at the higher end of the sentencing table.

*Lauersen II,* 362 F.3d at 164.  *See also United States v. Savin*, No. S1 00 CR 45 (RWS),

2004 WL 1161323, at *7-8 (S.D.N.Y. May 25, 2004) (court granted four-level downward

departure in investment fraud case because of the substantially overlapping nature of

enhancements for loss, effect on financial institution and more than minimal planning);

*Adelson,* 441 F. Supp. 2d at 510 (court noted that the combined effect of overlapping

enhancements "represents ... the kind of 'piling-on' of points for which the guidelines have frequently been criticized").

In this case, assuming a 20-level loss enhancement because losses are greater than $7 million and less than $20 million, David should receive a "cumulative effects" downward departure because the cumulative effect of substantially overlapping enhancements for: (1) the loss amount (§ 2B1.1(b)(1)(K)); (2) for an offense that involved a violation of the securities law by an offender associated with a broker-dealer (§ 2B1.1(b)(17)(A)(ii)); and (3) if the Court rejects the *Fernandez* argument set forth above, an enhancement for substantially jeopardizing the safety and soundness of a financial institution (§ 2B1.1(b)(15(B)(i)), will cause an extreme and disproportionate increase of David's sentence at the high end of the sentencing table.

Finally, the enhancement sought by Probation (but not by the Government) for the endangering the soundness of a financial institution would lead to a particularly unfair result. While under the plain meaning of the Guidelines, Rochdale qualifies as a "financial institution," presumably, that enhancement was included in the Guidelines to punish rogue traders at vastly larger financial institutions who put those institutions at risk. Rochdale is not an investment bank like JP Morgan, Goldman Sachs or Societe Generale. Indeed, a trading loss of this magnitude by a rogue trader at those firms would likely never threaten those financial institutions at all. Ironically, an unauthorized trade and resulting loss at a smaller firm is dealt with more harshly than unauthorized trading at a very large firm. This is the opposite of what is intended by that enhancement.

### 3. The Court Should Depart Downward Under U.S.S.G. § 2B1.1 Because the Total Offense Level Substantially Overstates the Seriousness of the Offense

U.S.S.G. § 2B1.1(b)(1) itself authorizes a court to depart downward where "the offense level determined under [that] guideline substantially overstates the seriousness of the offense." U.S.S.G. § 2B1.1 (App. Note 19(C)). While we in no way attempt to undercut the seriousness of the offense, nevertheless, the resulting high offense level here substantially overstates the seriousness of the crime. *Id.* (*See also* PSR ¶ 78).

As observed in *United States v. Adelson,* the Guidelines place "inordinate emphasis" in fraud cases on the amount of actual or intended financial loss. *United States v. Adelson*, 441 F .Supp. 2d 506, 509 (S.D.N.Y. 2006), *conviction aff'd* 237 F. App'x 713 (2d Cir. 2007). The Guidelines, "in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." *Adelson,* 441 F. Supp. 2d at 509. "In many cases ... the amount [lost] is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004).[9]

The "heartland" offense which governs all theft and fraud offenses under § 2B1.1 would be to steal funds outright. David's offense, however, was to illegally put the credit of Rochdale at risk which lead to the huge losses. In addition, while he certainly had reason to believe that there could be losses in the millions if the trade did not work, he

---

[9] *See also* Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker,* 20 Fed. Sent. R. 167, 171 (Feb. 2008) (criticizing fraud loss Guidelines for "fail[ing] to distinguish between defendants who intend to steal or cause economic harm to others and defendants who, though guilty of criminal conduct, cause losses they neither desired nor perhaps even foresaw.")

did not foresee that Rochdale would have insufficient capital reserves, be forced to cease trading and later be out of business. (Letter of David Miller at p. 5, Ex 46). To mechanically apply a loss enhancement that would treat David the same as a defendant who set out to and did steal $5.2 million would substantially overstate the seriousness of the offense.

B.      18 U.S.C.3553(a)

It is well settled that once this Court determines the appropriate Guidelines calculation, it must then turn to what has been referred to as the "bedrock" of all federal sentencing: 18 U.S.C. § 3553(a) (" 3553(a)"). *United States v. Gupta*, 904 F. Supp. 2d 349, 353 (S.D.N.Y. 2012). In addition to the downward departures that are warranted for the reasons set forth above, there is an independent basis for a variance from the Guidelines range when this Court does an analysis pursuant to 3553(a).

The Second Circuit has never given specific guidance as to what weight should be given to the advisory Guidelines range or the factors enumerated under § 3553(a). It is up to the court's discretion to determine what is reasonable under the circumstances of each case. *United States v. Pope*, 554 F.3d 240, 246-247 (2d Cir. 2009) (internal quotations omitted) ("Generally, if the ultimate sentence is reasonable and the sentencing judge did not commit procedural error in imposing that sentence, we will not second guess the weight (or lack thereof) that the judge accorded to a given factor or to a specific argument made pursuant to that factor.") More simply put, the sentencing judge is entitled to find all the facts appropriate for determining either a Guideline sentence or a non-Guideline sentence. In this case, where David Miller's history and character references are exceptional – other than his conduct here, he has lived a law-abiding and

positive life filled with generosity and works of kindness for others, has been a

outstanding son, father, husband and friend and he has otherwise contributed significantly

to his community, and where his conduct was motivated by despair and depression

brought on by a confluence of unfortunate circumstances in his personal and professional

life -- we submit that the 3553(a) factors weigh in favor of the imposition of a non-

Guidelines sentence.

It is worth re-stating here the seven factors set forth for the Court's consideration

in 3553(a):

- the nature and circumstances of the offense and the history and characteristics of the defendant.  18 U.S.C. § 3553(a)(1);

- consideration of the general purposes of sentencing, including: "the need for the sentence imposed-- "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; "(B) to afford adequate deterrence to criminal conduct; "(C) to protect the public from further crimes of the defendant; and "(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  § 3553(a)(2);

- "the kinds of sentences available," 18 U.S.C. § 3553(a)(3);

- the Sentencing Guidelines, 18 U.S.C. § 3553(a)(4);

- any relevant policy statement issued by the Sentencing Commission, 18 U.S.C.; § 3553(a)(5);

- the need to avoid unwarranted sentence disparities, 18 U.S.C.; § 3553(a)(6); and

- the need to provide restitution to any victim. 18 U.S.C.; § 3553(a)(7).

*Gall v. United States,* 552 U.S. 38, 49-50, *fn.* 6.

1. **The Nature and Circumstances of the Offense and the History and Characteristics of The Defendant (3553(a)(1))**

    a)      The History and Characteristics of David Miller

18 U.S.C. § 3662 provides that "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court . . . may receive and consider for the purpose of imposing an appropriate sentence." *See also Pepper v. United States,* 131 S. Ct. 1229 (2011) ("We have emphasized that 'highly relevant -- if not essential -- to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'") (citations and quotation omitted).

As evidence of David's background, and as a testament to David Miller's character, the Court has been provided with more than eighty-five individually crafted letters that were submitted to the Court on his behalf.[10]  These letters have been personally drafted by friends, relatives, neighbors and co-workers over the course of the last several months.  These people all stand behind David despite full knowledge of his conviction.  As is clear from the letters, all of these people believe in the power of David's redemption and want to educate the Court on the value of David's life as a whole.  All of them beg for some degree of mercy from the Court on behalf of David, his wife Kristen, and their three small children.

As the Court will see in the letters submitted on David's behalf, he has been described as many things, including, "quiet, gentle, thoughtful, studious and compassionate." (Letter of Marietta L. Baldwin Morales at p. 2, Ex 1); "reliable, kind,

---

[10] Those letters have been submitted in a separate binder that is individually tabbed with a table of contents for the Court's convenience.

giving and warm ... understated to a fault," (Letter of Lucia Casagrande Petrone at p. 2, Ex 8); "generous beyond expectation" (Letter of Paul Whitcomb at p. 1, attached as Ex 85); "Faithful, dependable, loving, [and] giving" (Letter of Christopher Johnson at p. 2, Ex 24); "gentle and unassuming." (Letter of Gerard Duffy at p. 1, Ex 14); "a gentleman in every way," with "traits for patience and kindness." (Letter of Robert V. Griffo at p. 1, Ex 23); and, in the words of Peter Eschmann, a friend who met David through their children, as "one of the finest individuals I have known during my lifetime even despite what occurred last year." (Letter of Peter and Laurie Eschmann at p. 2, attached as Ex 17).

What is most significant about the letters is not their sheer number, but, instead, the deliberate care and consideration that was obviously invested by each individual author. And while some are hand-written and some are typed, some are more eloquent and some more simple, all of them clearly speak to one or more positive character trait(s) that David has exhibited during the course of his 41 year life.

(1)     David's Works of Charity and Kindness to Friends

Time and time again, people who know David have offered witness to his generosity to others. Clearly, David Miller is not the type of person who stands idly by to watch another man struggle. He is the family member, friend and neighbor who is first to pitch in when someone is in need.

His neighbor, Gerard Duffy, explains how the day that Gerard moved into his house ten years ago was a hot, humid August day and David walked right up to Gerard and a few friends who were moving items with a pitcher of water. David then proceeded to help during the course of the day, carrying boxes into the home, moving furniture and

even bringing an air conditioner that he insisted was "an extra".  David installed the air conditioner that very day in the Duffy home.  As Gerard explains, "[David's] immediate thoughtfulness and charity to a perfect stranger left an impression I would not forget." (Letter of Gerard Duffy at p. 1, attached as Ex 14).  Gerard and David later grew to be friends and Gerard asked David to be the godfather to one of his children because as Gerard and his wife, saw it, David was the "type of person that [they] wanted to be guiding [their] daughter in her religious development."  As Gerard further explains, "[e]ven in light of what David has done in the past year, I have no regrets – it was the right choice then and continues to be the right choice today."  (Letter of Gerard Duffy at p. 2, attached as Ex 14).

Jennifer Duffy, Gerard's wife, describes how David jumped into action on the day that the Duffy family dog bit the mail carrier, and how he removed the dog from the situation and consoled their distraught child.  She explained further that David comforted her child when neither parent was available to do so.  (Letter of Jennifer Duffy at p. 2, attached as Ex 15).

Another friend, Peter Eschmann, explained how after his daughter broke her leg in a ski accident, one of the first calls he made was to the Miller family.  During the following three month recovery period, David and his wife constantly did everything they could to help the Eschmanns.  As Peter explains, David was constantly bringing his children over to cheer up Peter's child while she convalesced.  "David was a good friend during that period and a constant source of comfort.  He helped in any way that he could."  (Letter of Peter and Laurie Eschmann at p. 2, attached as Ex 17).

Mary Marks, an attorney who practices corporate and antitrust law in New York, and who has known David through their children, recalled when the Miller and Marks children made their communion. "As we were leaving the church after the ceremony, David realized that we did not have a party to attend that day and invited our family of five to join the Millers at their daughter's party at a local restaurant. This caused some difficulties for him, as the seating and food had to be changed to accommodate additional people at the last minute, but David took it in stride and made sure that we felt welcome." (Letter of Mary K. Marks, Esq. at p. 1, attached as Ex 43).

Kathleen M. Tighe, a widow who lost her husband in 9/11 and was left with four children (the youngest six months old at the time), describes how David always generously gave his time to her and her children. "I can't even begin to count the number of times that Dave 'stepped up to the plate' for me and my family! During numerous occasions when there was a conflict with schedules…Dave never hesitated to take my daughter Lindsay in as another member of his family. To top it off, he not only enabled our daughters' friendship to grow so beautifully, but he would ALWAYS make things extra special for my daughter, Lindsay, when she was with the Miller family! She would always get dropped off to me with a special treat of ice cream, cookies that were baked while she was with them, …or even the latest Disney movie review. David made my job as a single mother with 4 children more bearable than I could even imagine!" (Letter of Kathleen M. Tighe at p. 1, attached as Ex 76).

Others describe simple acts of kindness in an everyday life, such as Angelo Ferrugia who describes how, when his mother was sick and he and his brother were far from home in California, David regularly checked in on her, moving her car off the street

and running errands for her when needed.  Mr. Ferrugia describes these little acts of kindness by David as not random or out of the ordinary but, instead, as "part of his DNA."  (Letter of Angelo Ferrugia, Ex 21).  Patricia Etienne describes how David is the type of person who left flowers on her doorstep when he learned about her breast cancer diagnosis.  (Letter of Patricia Etienne at p. 2, Ex 19).

Finally, his old college friend, Paul Whitcomb, explains it: "I have personally witnessed (in college and throughout the remaining years of our friendship) times when Dave has helped people when he himself could have used a hand.  It is part of his nature to want to try to help people."  (Letter of Paul Whitcomb at p. 1, Ex 85).  "When I had made a poor financial decision and lost money in the stock market, Dave knew money was tight for us.  He stopped by one day with a check for me and told me that he had it and knew we needed it.  He made crystal clear that it was a gift and we shouldn't dare even think about paying him back."  (Letter of Paul Whitcomb at p. 1, attached as Ex 85).

(2)     David's Dedication to His Mother and Brother

While David has described his true admiration for his mother, who he has described as a "fixer" who "did everything" for him and his brother, many in David's family talk about his dedication to her.  (PSR ¶ 43)  His aunt, Frannie, describes one small but illustrative example of David's dedication to Nora:

> His mother worked two or three jobs to provide for her boys and *after* they both finished college, she started night school. She went from getting her GED to eight or ten years later, finally earning her CPA degree.  During this time, she had the same very old, dilapidated car that kept breaking down.  My brothers kept fixing her car to keep her on the road back and forth to work and to class.  David decided to surprise his mother and, with much 'arm twisting,' he convinced his brother John to chip in and buy Nora her first and only new car in her entire life.  Nora was overwhelmed to say the least.

David then gave the credit for the idea to his brother. The car is about 10 years old now but looks brand new because David has had the car detailed for her every year since he bought it for her. David knows how much his mom sacrificed to bring him up and he takes care of her. He truly appreciates what she has done for him. This is one small story of the considerate and humble person he is.

(Letter of Francesanne Li at p. 2, attached as Exhibit 33).

As Nora describes it: "Even during these past few months with all the stress, David is still being the kind, thoughtful compassionate person he has always been; dropping off my car at the mechanics, watching out for his brother, or going to one of my friends' mother wake, never mentioning that he went." (Letter of Nora Petrone at p. 2, Ex 67 ).

Although John is the older brother, Nora and others talk about how David has actually been the one to take care of John all these years. John suffers periodically from severe bouts of depression since his life threatening accident when serving as a Merchant Mariner over 14 years ago. David constantly helps John work through his difficult times, includes him in his daily family life, reminds him to take his medication when needed and spends time bolstering his spirits and helping him move forward. He is John's closest friend and John depends greatly upon his love and support and encouragement to get through his life. (Letter of Marietta L. Baldwin Morales, Ex 1). John describes how much David has done for him when he states simply: "I owe a lot to David -- far more than he owes me." (Letter of John Miller, Ex 47).

(3) David's Conduct as a Husband and Father

Maria Petrone, an aunt who has four grown children 17 years and older, describes how David, Kristen and her mother were the only three people she ever trusted to watch

her kids when they were younger.  (Letter of Maria Petrone at p. 1, Ex 63).  In describing

David as a father, she shares one of her memories: "When Dave and his family spend

time with us at our house in Pennsylvania, he is the one I find awake with his early risers.

I specifically remember one morning waking up finding him playing cards with Kendall

at 8am with Matthew in his arms feeding him cereal.  I thought to myself if my kids were

up this early, I would not be playing cards."  (Letter of Maria Petrone at p. 2,  Ex 63).

Peter T. Shimkin, an attorney and Managing Director at Newmark Knight Frank,

describes David with the children.  "Dave's demeanor and patience with the girls on his

soccer team showed his good nature and his genuine love for children (not just his own).

He always had a kind and encouraging word for the weakest players of his team."  As a

father, he describes how, "[e]very summer, I always see Dave at the beach playing with

his kids, doting them with love, while other fathers were sitting around drinking beer,  I

always admired how much of a family man he is/was, which makes his conduct so out of

character to the person I've known all these years."  (Letter of Peter T. Shimkin, attached

as Ex 71).

Family friend Kathy Tighe describes David's conduct as a father as told to her by

her daughter:

> "One of the most heartwarming stories I have of Dave that
> will remain with me for the rest of my life, and paints the true
> picture of the Dave we all know and love, came when his
> daughter, Kendall, and my Lindsay were about 6 or 7 years
> old.  Lindsay spent the day at the beach with the Millers (yes,
> they were so gracious to invite her to their "family day" so she
> would not be stuck in a car with me while I drove my oldest
> son to Maryland for a lacrosse camp).  After I picked her up, I
> asked her how her day was… and without any hesitation at all,
> she said, "Mommy, we had sooo much fun today!...Can I get a
> daddy just like Mr. Miller?"  Needless to say, the tears started
> and my heart ached…(not only for her, but for all children

who grow up without a father's presence), and at the same time , my heart was warmed because my daughter recognized in Dave the most important qualities of a father figure!"

(Letter of Kathleen Tighe, Ex 76).

The letters in support of David are replete with accolades regarding his role as a father to his three young children:

"As parents,  David and Kristen set the utmost example for Timmy and I.  They put their children first in every way: sports, school events, recitals, homework, competitions, volunteering, coaching, donating and being active members in the St. Agnes Mothers and Fathers club have always been an integral part of their lives." (Letter of Lucia Petrone at p. 2, Ex 8).

"I have always known David to be patient, loving and attentive to his children."  (Letter of Christine D'Allesandro, Ex 10)

"I remember one time when I was there and Kendall was home from school sick, Dave brought her flowers when he came home from work.  Something he does for both girls when they are sick."  (Letter of Sandra Mansfield at p. 1, Ex 42).

"[T]he type of Dad that sits through three dance recitals on the same day because his daughters are in it. He is the type of Dad that comes home from work, changes his clothes and plays with his kids and helps them with their homework."  (Letter of Sandra Mansfield, Ex 42).

"Anytime I see him in town he always has one of his children with him." (Letter of Eric S. Engelhardt at p. 2, Ex 16).

"The dedication and patience I have witnessed through sand castle building, jumping over waves, long walks (ultimately to get the kids to nap), and cooking everyone's favorite on the barbeque have become a routine in my life, which I learned from him.  He has always been a good role model for me with respect to child bonding and parenting."  (Letter of Robert V. Griffo at p. 2, Ex 23).

Perhaps David's traits as a parent are best displayed by the character of his children. As Jackie Smith, states: "You don't know the Miller children but I do. They are respectful, polite, considerate, good sharers, sweet, kind, smart ...everything you want in a child. They are a reflection of Kristen and David. They are a product of their upbringing." (Letter of Jacqueline Smith at p. 2, attached as Ex 72).

(4)     David's Dedication to His Extended Family

Beyond being a commendable son, father, brother and husband, David has managed to cultivate positive relationships as a nephew, cousin and brother-in-law. David hails from a large family, and what is most revealing from all the letters submitted is how each family member describes a unique and special way that David has touched his or her life. For example, his aunt, Mary Petrone, describes how when visiting from Florida David insisted that she borrow his car even though it was brand new so that she could save money on a rental car and how his trust in her touched her . (Letter of Mary Petrone at p. 3, Ex 64).

David's uncle, Vincent, describes how almost twenty years ago when David started in finance, Vincent decided to give David $10,000 to invest in the stock market for him. David invested the money and, as Vincent describes it, "the market tanked" and he lost the investment. As Vincent describes it, he understood that there was risk and took the loss in stride. "David was more upset than I was," Vincent explains. Two years later, after David started earning money, he showed up at his uncle's house with a check for $10,000 and tried to replace his uncles lost investment. (Letter of Vincent Petrone Ex 69).

As a teenager, when most adolescents are moving away from their family and losing sight of the importance of familial bonds, David's aunt describes how he was dedicated to his extended family. "I remember as if it were yesterday how excited David was when he came to meet Joey for the first time. David came to our house by himself with a gift for Joey. That has always left an impression with me because I thought at such a young age that was a very mature gesture." (Letter of Maria Petrone at p. 1, Ex 63).

His cousin, Stacy Carbonara, describes how David as a young recent college graduate would drive down to his alma mater, Towson University, to visit his girlfriend and, one weekend, offered to take his cousin down for a visit. Ms. Carbonara explains how he sacrificed the whole weekend just to show her around the campus and explain what the school had to offer, never allowing her to pay for gas or a meal. (Letter of Stacy Carbonara, Ex 7)

After she was diagnosed with cancer, Lauren Ewe states, "I was terrified cancer would take me away from the people I loved. Amongst the fear and feelings of hopelessness, people emerged desperate to lend a hand. My cousin, David Miller, was one of them. His concern was immediate and his action determined. He inquired how he could find out if he was a donor match for me. Amid his own everyday responsibilities of being a husband, father, and provider for his family, his desire to help became a priority. Without hesitation, he got tested…His loyalty and caring, along with the support of other family members, gave me strength to believe I could overcome this daunting diagnosis. Faith was re-instilled by people like David." (Letter of Lauren Ewe at p. 1, Ex 20).

Virtually all of his extended family speak time and again about how David and his wife, Kristen, have together assumed the huge task of organizing the Petrone family Christmas party: "Each and every year, Kristen and David organized the venue, arranged for the collection of the participation fee, set up the crafts and made sure that everyone was included. Most importantly, they always made sure that all of the children had a terrific time, not just their own." (Letter of Marietta L. Baldwin Morales at p. 2, Ex 1). As Maria Petrone notes, "Dave and Kristen have been planning this Christmas celebration for many years because they wanted to see this tradition continue. If it were (sic.) not for Kristen and David organizing this wonderful event I am sure it would have discontinued." (Letter of Maria Petrone at p. 2, Ex 63). Unfortunately, as Marietta states, "This year, for the first time David and Kristen just could not handle organizing the party. That change, I fear, portends significant other changes that are on the horizon for the Miller family." (Letter of Marietta L. Baldwin Morales at p. 2, Ex 1)

       (5)    <u>David's Dedication to Kristen's Family</u>

A review of the letters submitted by Kristen's family are perhaps the best illustrations of his generosity and kindness to others.

Kristen's sister, Michelle, describes how after David completed his senior year of college, Kristen remained at school. She was driving a broken down and unreliable car and David worked to save and buy himself a brand new car. Rather than know that his girlfriend was driving the unsafe vehicle, he insisted that she take his new car instead with her down to Maryland. He remained in New York driving her old car. (Letter of Michele Strandberg at p. 1, Ex 74).

Kristen's family fell on hard times and was in the process of losing their home to foreclosure when Kristen was away at college. Michelle, describes how although Kristen was not living in the home, David would stop by to check on Kristen's family. "I remember one time he came over and took me out to just talk and to try to reassure me. It made me feel so good that he really cared about me that much. I didn't see him everyday but just him stopping by to listen to me cry and get things off my chest was so dear to me and comforting." (Letter of Michele Strandberg at p. 1-2, attached as Ex 74). After the foreclosure Kristen's parents were forced to rent an apartment with three of their children. Michelle explains how every holiday, birthday or even for a barbecue, David opened up his home as a gathering place for the Mansfields because their apartment was not a comforting place. "He kept us all as a family and I am so grateful for that." (Letter of Michele Strandberg at p. 2, Ex74)

As one of Kristen's brothers explains, "David has stood by my sister and our family through the good times and the bad times. When my brother and I were in high school we lost are [sic] house to foreclosure. I remember David being there to help us make it through that tough time in our lives. He was there to help us move into a small apartment. He never took pity on us but helped us by lightening up our mood and picking up our spirits with a joke or a funny comment." (Letter of Laurence P. Mansfield at p. 1, Ex 40).

Laurence Mansfield, Jr. also described how in better times David always found odd jobs for him to do around David's house and paid Laurence generously. In addition, as Laurence explains: "When my first car died he sold me his old car for a price that he could have sold for double the amount. David did not keep the money I paid him for the

car; he put it in to an IRA retirement plan for me. That's the kind of things he would do for me. He is always willing to help selflessly never looking for something in return." (Letter of Laurence P. Mansfield at p. 1, Ex 40; see also letter of Michele Strandberg at p. 2, Ex 74).

David's father-in-law, a person who is certainly justified in his disappointment with what David has done, nevertheless stands behind David. As Mr. Mansfield explains, David has a long history of kindness directed at the Mansfield family: "I was a bank vice-president until I was downsized in the mergers of the 80's and 90's. I became an independent financial adviser and work strictly on commission. Cash flow is sometimes an unexpected embarrassment when they do not come promptly. David has advanced me in the past $5-10 thousand dollars without question. David has also performed many chores for me and my wife that I could not get to as I work 7 days a week, and spare time is at a premium. He has painted my house on several occasions and replaced kitchen appliances without looking for credit or financial payment." (Letter of Laurence R. Mansfield, Ex 41). He further described how David bought Kristen's brother a car so that he could commute to college without asking for or accepting re-payment. In addition, David Miller was also quietly sending Kristen's brother a stipend while he was attending college "quietly and without looking for credit." (Letter of Laurence R. Mansfield, Ex 41).

Perhaps the most touching testament to David's good nature comes from his mother-in-law, Sandra Mansfield, known as Sandy, and a person who has known David since he was a high school student dating her daughter. David's actions with the Apple trade have hurt very few people more than Sandy's daughter, Kristen, yet Sandy still

describes David as "everything I could have asked for in a husband for my daughter and a father to my Grandchildren." (Letter of Sandra Mansfield, Ex 42). Sandy offers the Court two touching experiences that shed light on the background, character and conduct of David Miller, *see* 18 U.S.C. § 3662:

> While cleaning out a dresser draw recently I found a card David had sent me in 1997. My husband and I were going through a difficult time, he lost his job and we lost our home. The card was filled with hope and inspiration and I remember how much it touched me. David was so young at the time and it was so thoughtful and showed so much compassion, a quality I find admirable in a man." (Letter of Sandra Mansfield at p. 2, Ex 42).
> …

In addition, Sandy describes David's act of charity to a total stranger: "I remember one Christmas when Tickle Me Elmo's were extremely hard to come by. David was able to get one but what he did with it still warms my heart. He took it to North Shore University hospital and donated it to Pediatrics. I think the recipient was a little girl that was spending Christmas in the hospital. He never said a word about doing it, my daughter told me about it. That is the way David is, he never looks for a pat on the back or any recognition" (Letter of Sandra Mansfield at p. 2, Ex 42).

      b)     <u>The Nature and Circumstances of the Offense</u>

By referring to the "circumstances of the offense" as a part of the 3553(a)(1) analysis, the Guidelines direct this Court to consider *why* and *how* the crime occurred; in other words, what the motivation was and how the offense unfolded. When these factors are considered, the advisory Guidelines range of 78 to 97 months is revealed to be a punishment significantly beyond that which fits the crime.

First, although no doubt a crime with devastating consequences, unlike a Ponzi scheme or a long term fraud, David's crime was a one day event. It occurred over a very

short period of time.  He did not, as is so common in many white collar crimes, compound the losses over weeks, months or years; he did not lie, cheat and steal day in and day out to perpetuate his fraud.

Moreover, he did not commit an ongoing crime to support an opulent or extravagant lifestyle.  As set forth above, and in many of the letters submitted on his behalf, David lived a rather simple life in a three-bedroom house with three children and a homemaker wife.  There were no expensive country club memberships, luxurious cars or boats.  While David would be the first to admit that there were things that he should have cut back on, all of these were expenses for his children or his family as a whole, and not for him individually, so he justified them to himself.

All white collar crimes are undoubtedly motivated by greed, but there are levels and degrees of greed.  As he has stated, David was either "too proud" to admit it to himself, or too embarrassed to acknowledge to his family that he simply could no longer afford to give them the things to which they had become accustomed.  As a result, his hole grew deeper and his desperation to get out of it more profound.  Although he did undertake an act of "greed" when he tried to solve all his problems in one day, it was a different crime than one sees in cases such as Bernard Madoff, Mark Drier or Alan Sanford.  As stated by Brian Newberry, another New York City firefighter and friend of the Millers: "Dave, I believe, has fallen a victim of desperation.  Acts of desperation aren't made by evil or bad men, their [sic] made by men who do the right thing all the time but find themselves backed in a corner, and it's at that point at which our judgment get (sic.) clouded and a desperate decision is made."  (Letter of Brian Newberry, Ex 54).

One can (and should) criticize David insofar as many people (especially in the past five years) have incurred difficult financial times and not resorted to the criminality that he has, especially since he had other options: bankruptcy or assistance from family members (as he is receiving now). However, in the words of cousin James V. Petrone: "You may wonder why with such a helpful family to rely on, David would not ask for financial help. If you know David, you know that he is not one to ask for help, he's one to give help." (Letter of James V. Petrone at p. 2, Ex 60). David was just not capable of sticking his hand out, as he should have. Now, he has no choice.

His college friend, Paul Whitcomb, a successful businessman and entrepreneur who has known David more than twenty years, describes it better than anyone:

> In recent years, I have noticed stress in Dave's life associated with his changing industry, changes in jobs, commute to Connecticut every day, stints of unemployment and serious negative changes in his neighborhood. Through it all he has been able to keep a positive outlook on life and remained true to his character, a loving and involved father and husband, always finding ways to help someone out or just be a positive force in their life.
>
> Knowing Dave as well as I do, I have to say that I was completely shocked to hear what he had done. At first I thought he was joking when he told me what happened, but as he opened up about what he did and what drove him there, I regrettably realized that I was not as good a friend to him as he has been to me over the years. I was not there for him as he had been for me so many times. I never probed deep enough when I saw the stress; I just assumed it was regular every day issues of life that we all face. I should have asked more, I should have been there for him, I should have been able to help him out of this jam before it happened.

(Letter of Paul Whitcomb at p. 2, Ex 85).

In addition, while it does not make David any less guilty -- *and we do not wish the Court to take this to mean that David sees this as an excuse* – nevertheless, it is worth

noting that the scheme was not his idea. Harlan Sender devised it, proposed it and set it in motion. David is guilty, he accepts that fact and he will accept his punishment when the time comes, but it should be known by this Court, and others, that David Miller was not capable of devising such a plan. Indeed, when one looks at the whole picture -- the graphs and charts that David has described Sender showing him, repeated analyst reports regarding the Apple stock sent by Sender to David, the emails sent to David previously talking about Apple's earnings, including the July email where Sender tells David not to "overthink" the transaction (Ex 88), and the comforting manner in which Sender consoled David after David failed to deliver on their conspiratorial plan the first time -- it is clear that Sender saw David as the perfect mark. Sender was well aware of David's personal problems, in particular, that he was despondent about his overall financial circumstances, bitter over his housing situation, frustrated with his employer and his commute to work and desperate to move from his home but wholly unable to do so because it was "under water" in real estate parlance. Sender proposed to David the "quick fix" answer to his problems and David, wholly ignoring his own moral fiber, was foolish enough to grab it. While she does not support or condone the choice David made in the fall of 2012, Diedre Doherty says it best when she pleads on David's behalf: "What has happened is tragic in many ways and I believe that David was taken by an enticement during what could only have been a very vulnerable moment in his life." (Letter of Diedre Doherty at p. 2, Ex 13).

Sender had no risk and all possible reward. At the end of the day, if the trade worked, Sender claimed it as his own, sold the Apple stock in the after-hours market and gave David whatever he chose to give him. If the trade did not work out, Sender simply

denied it was his. The email request for the trade ("b 125 ok (per half hour)", see Information at ¶ 11) and David's subsequent email confirmation of the trade (at the reduced number) was Sender's "get-out-of-jail-free" card. Once again, none of these facts make David less culpable or less responsible. Indeed, he acknowledges that once he decided to commit the illegal scheme, he went even further to devise the short position; nevertheless, these facts are worth this Court's consideration when, as it must, consider the "circumstances of the offense" under 3553(a)(1).[11]

Probation notes that: "This was not a scheme devised simply to allow Mr. Miller to pay off his debt, which taken in total was less than $1,000,000. *Assuming the proceeds were to be devised evenly*, Mr. Miller would have been left with more than $6,000,000 remaining after clearing his debt." (PSR ¶ 83) (emphasis added). However, there was never such a clear agreement between David and Sender. In fact, David has stated that he had no idea or guarantee what Sender would give him. He was hoping for half but did not know what it would ultimately be but, as he has stated, "anything would have been better than what he had, which was nothing." This is further evidence of David's desperation and the simple fact that his mental and emotional states at the time the crime was committed were compromised.

Finally, and perhaps most striking, the PSR notes that thirty-nine employees at Rochdale lost their jobs as a result of David's conduct. We respectfully ask the Court to consider that such a number is slightly overstated and misleading. First, most of the individuals who are identified as having lost their job were independent brokers who

---

[11] If the long position worked (i.e. the Apple Stock rose) and David received his share of the profits, it would have been impossible for the short seller, Saratoga, to incur a loss on this trade. David would have had more than sufficient monies (assuming Sender shared the proceeds with him) to cover the short sellers position with the proceeds from the long position. If the stock price dropped (as it did), Saratoga would be holding a profitable short even if they were not willing to let David have it.

traded through Rochdale.  They simply used Rochdale to execute their trades and were

compensated (as David was) by splitting their commissions for their trades with the

principals of Rochdale.  For these employees, their clients presumably remained their

clients after the October 25 trade (albeit at a different broker-dealer).  Those professionals

were capable of taking their business elsewhere.  Rochdale was not, for example, a

manufacturing business, a restaurant or a bank where everyone who lost their job had to

start over.  That is not to say that the damage wasn't severe or that there were not people

who truly lost employment as a result of David's actions.  Undoubtedly, for example, the

principals of the firm lost not only significant money but also their employment.  In

addition, the back-office and support staff lost their jobs.  Thus, we fully recognize that

jobs were lost and many people were hurt in many ways.  Nonetheless, from our

investigation (which included FINRA broker checks for each of every known registered

broker that worked at Rochdale) almost every broker is now trading through a different

firm.  Therefore, the implication as set forth in the PSR that 39 people are now

unemployed as a result of David's conduct appears to be a bit of an overstatement.

        c)      <u>David Miller's Depression and Anxiety</u>

We have argued that David's conduct was motivated by a sense of desperation and

extreme anxiety brought on by a number of events in his life.  This theme was repeated

throughout the myriad letters submitted by his family and friends.  David's mother, who

worked closely with David to help him resolve his serious financial issues prior to his

commission of the offense, saw first-hand how David's mental and emotional states were

rapidly deteriorating:

> I thought David was headed for a nervous breakdown… I
> believe that David was drowning and the walls were closing

in…. My heart broke for him. His life was falling apart and he was on the brink. In looking back on it, I have asked myself if he was already going through a nervous breakdown months before the October 2012 event? While I was in fear of a job loss, a nervous breakdown or some form of serious mid-life crisis adjustment, I never thought it would be something like this. I know that I am not a psychiatrist, but I am convinced that, at a minimum, he was suffering from some level of depression and despair. Of course, after October 25, 2012, his mental state got even worse. He was losing weight and he told me he wasn't sleeping much. He has suffered severe anxiety, has gone through mood swings (suicidal thoughts – he expressed to John); sadness, and un-worthiness.

(Letter of Nora Petrone at p. 5, Ex 67)

After David committed the offense, his mother observed that his mental state understandably grew even worse:

Initially, David was sitting for hours on the couch just starring at the t-v. He wasn't responding even to simple questions. He was sleeping on the couch for weeks, or I should say, not sleeping. The first two months after this occurred were difficult. Kristen said he was fine, and I knew he wasn't. I told his brother not to leave him alone. His oldest daughter, Kendall, was very quiet and nervous. She would sit in the chair and read her books. If David got up she would follow him into the kitchen. Kendall, being 11, was very in tune to the mood of the house. She questioned why David wasn't going to work. Their other daughter, Lindsay, was scared.… The kids were clinging to David and many times David was not responding…. If it weren't for the kids, I think David would have been in a psychiatric hospital.

(*Id.*)

For whatever reasons, despite his otherwise good nature and general positive character traits, David Miller had weaknesses in his psyche that others were not aware of. In the end, he was someone who simply lacked the inner strength to face his problems appropriately and deal with his perceived substantial failures as the husband/father/provider figure. It was because of this, that he fell so easily prey to

Sender's criminal proposal.  None of these things, however, occurred in a vacuum (or excuse his conduct) but as this Court knows, there is a reason for everything.  It may have been his upbringing and his lack of a strong father figure in his own life.  As his aunt Frannie states:

> I think it is important to keep in mind that the most important male role models David Miller has had were physically and verbally abusive men.  Despite this, he grew up a very quiet, soft spoken child.  As an adult, he is now a quiet, soft spoken man.  I think perhaps David grew up afraid to draw attention to himself so he wouldn't set anyone off.

(Letter of Francesanne C. Li, Ex 33).  Perhaps it was his tendency to internalize and inability to ask others for help that caused him to snap.  Regardless of the reason, at the end of the day, David refused to become his father or his wife's father (who lost a home in bankruptcy).  This resulted in a desperate ploy to commit not one but two unauthorized trades.  His criminal conduct was therefore aberrant and out of character.

t





**2.** **The General Purposes of Sentencing Will Be Satisfied By A Sentence Substantially Below the Advisory Guidelines Range (3553(a)(2))**

Title 18 U.S.C. section 3553(a)(2)(A)-(D) instructs courts to seek the following

goals through sentencing: (i) to reflect the seriousness of the offense, to promote respect

for the law, and to provide justice for the offense; (ii) to afford adequate deterrence to

criminal conduct; (iii) to protect the public from further crimes of the defendant; and (iii) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)-(D).

The offenses for which David has pleaded guilty are indeed serious ones. David clearly acknowledges this, and shows his genuine remorse when he states: "I am sincerely sorry for all the people I have hurt and I know that there are many." (Letter of David Miller at p. 1, Ex 46). Others have observed David's remorse and genuine regret for his conduct as well:

- Although he is surrounded by friends and supporters in the community, David is rarely seen, I assume because he is ashamed and appreciates the consequences of his actions. (Letter of Christine D'Alessandro at p. 2, attached as Ex 10).

- "I believe that David is ashamed of his actions. I have tried to speak with him since reading the news in the paper, and he has not responded to me." (Letter of Daniel V. DeClue at p. 1, attached as Ex 11).

- Kevin Finnegan, a friend and a detective with the Suffolk County Police Department, explains how in discussing what David has done, David time and again expressed remorse and regret, "for those who his actions have hurt." (Letter of Kevin Finnegan at p. 1, attached as Ex 22).

- "The last thing David wants to do is socialize. He is a humble man and would never want sympathy. He is horrified by what he has done and knows he has to pay the consequences." (Letter of Maria Petrone at p. 2, Ex 63).

A prison sentence substantially below the Guidelines will still reflect the seriousness of the crime, promote respect for the law and also serve the twin penal goals

of specific and general deterrence. The public is at no risk of further crimes being committed by David Miler. In the words of Joseph Canty, a Lieutenant in the New York City Fire Department and a former police officer: "While I am not an expert in the law, I do know that David's arrest, public humiliation and prosecution have, in all likelihood, served a deterrent to any future criminal conduct by David. Please be assured that I say this knowing that I will never have to write a letter again for David. I am vouching for him because, as a Christian, I believe in forgiveness and mercy. I also believe in second chances. I know who David is as a man and can say for certain that he will never do something like this again." (Letter of Joseph P. Canty at p. 1-2, Ex 5).

Moreover, David has forfeited his licenses as a securities broker and will never again be able to participate in the securities industry. Courts have held the requirement of specific deterrence satisfied when the "[e]limination of the defendant's ability to engage in similar or related activities ... and the substantial loss of assets and income resulting from [his crime] have decreased for the foreseeable future his ability to commit further crime of the type he was tempted to undertake ..." *United States v. Gaind*, 829 F. Supp. 669, 669 (S.D.N.Y. 1993). He will never therefore be in a position capable of committing such a crime.

In the year since David's Apple trade, he has been living in a prison of sorts already. As many people have stated, he is rarely seen in public due to his obvious shame and embarrassment. Moreover, as described above, Nora, in her letter has explained how distraught David was in the immediate aftermath of the transaction to the point where he was unable to function. (Letter of Nora Petrone at p. 5, Ex 67).

His wife, Kristen stated: "We have paid for David's misdeeds since the second it happened. It's a constant strain in our daily lives and there is never a break from it. There's no living above our circumstances. Every moment brings us back to that day. The irony is that this makes our financial problems look trivial in retrospect. The devastation this has caused is widespread, I know this and, more importantly, so does David." (Letter of Kristen Miller at p. 6, Ex 48).

With respect to general deterrence, certainly, David's conduct, quick arrest and prosecution has served as a deterrent for others. No one could possible say what David did was worth the risk or that he has *not* paid a high price for his criminal conduct already. "David's actions have condemned him to a life of financial hardship. Finding a job in this economy is difficult enough, but having a criminal record will relegate him and his family to a life of low-paying, menial jobs. He knows it will cause embarrassment and humiliation to his wife and his children for the rest of their lives." (Letter of Charles D. Petrone at p. 3, Ex 57). Of course, he will do whatever he has to do for the benefit of his wife and children. It is worth noting, however, that David, who once had a job on Wall Street trading stocks, is now driving a bus to feed his family.

Furthermore, even a short prison sentence would be devastating to David and his family -- as it would be to any defendant similarly situated. In the words of Judge Jed Rakoff: "[N]o one really knows how much jail time is necessary to materially deter insider trading; but common sense suggests that most business executives fear even a modest prison term to a degree that more hardened types might not." *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012). Should this Court impose a prison term -- even one of a limited duration -- each and every day of David's sentence, he will

certainly look in the mirror and know that he is not providing for his family and not assisting Kristen or his children overcome the day-to-day struggles a family encounters. He will be  wracked by an unyielding, persistent sense of guilt, shame and regret for the burden that he has forced upon his wife and children.  David  appreciates more than most that "[d]ance recitals, concerts, scoring a goal at a soccer game, competing in a swim meet, simple moments to some, but in the world of a child, they are incredibly important. But without their parents to share those moments, to cheer them on, to be there for them when they succeed or fail, they just ring hollow."  (Letter of Christine D'Allesandro at p. 2, Ex 10).

His uncle, Charles states it simply: "The greatest punishment will be separation from his family.  Every day of separation will drive a wedge between David and Kristen and every day will be a day he will never get back as a family man."  When Charles writes about the dilemma that Kristen will face regarding prison, Charles encapsulates it this way:  "Does she take the children to visit or not?  If she takes them to visit the image of their father in prison will be forever imprinted on their mind.  If she doesn't take them to visit their father will become a stranger to them.  Either option is awful to contemplate."  (*Id.* at p. 3).  These are the circumstances in which David Miller has placed himself and even one month in prison will be serious "hard time" for him and his family.  A sentence within the Guidelines range is "greater than necessary" and would not satisfy the sentencing objectives of 18 U.S.C. § 3553(a)(2).

### 3. The Kinds of Sentences Available (3553(a)(3))

One of the factors to also be considered by this Court is the kind of sentences available.  The Court is not restricted only to a sentence of imprisonment.  The Court

could also fashion a sentence of home detention, probation and/or community service, or any combination of the above.

Community service orders as a condition of probation can serve as a significant sanction.  In a 2008 fraud prosecution in the Eastern District of New York, Judge John Gleason sentenced a defendant who had an advisory Guidelines prison sentence in excess of 120 months probation, home detention and community service.  In sentencing the defendant, Judge Gleason stated:

> The prospect of a sentence that does not include incarceration, which is explicit in the papers submitted by your lawyers, is a daunting one for no other reason than it might fail to promote respect for the law which is one of the things a sentence must do for someone who participated so integrally in a fraud from, as far as your piece of it is concerned, cost financial institutions, what, $110 million.
>
> * * * * * *
>
> In fact, you know, one might say how could, no matter what the timing of the cooperation, no matter how essential you were to the prosecution of the more culpable participants in this crime, how do you justify an intelligent, accomplished businessman such as yourself committing this type of crime and not being sent to jail, not being, having the punishment include that type of condemnation, the most significant form of condemnation a sentencing judge in a financial crime can mete out?
>
> But nothing should ever be out of bounds and I've struggled with your lawyer's request, struggled with it throughout the presentations I've heard here, and I conclude that a sentence that doesn't include incarceration is appropriate here. Alternatives to incarceration exist that can carry both the community and this Court's condemnation of your conduct but channel it in a way that's more constructive, given your significant charitable works and contributions before this case, given the extraordinary timing of your cooperation and its nature, given your age and your physical circumstances. I don't think the goals of sentencing here require you to be incarcerated.

> I'm placing you on probation for a period of five years. One special condition of probation would be that you be in home detention for a period of six months.
>
> Another is that you perform 500 hours of community service. It strikes me that you can do some good in your community. You already have. It seems to me you deserve it. The combination of circumstances in your case makes you worthy of serving your punishment in a manner that's a little more constructive than going to jail.[12]

Even if this Court deems that a term of imprisonment is necessary in this case, the Court could fashion a sentence that includes a shorter term of imprisonment followed by a term of home detention. Home confinement in the federal system may include a curfew, 24 hour-a-day 'lock down', community service, probation or any combination of the above.[13] The extent to which individuals are permitted to leave their residence is determined on a case-by-case basis, depending on the goals of supervision and the orders of the court.[14] If the Court determines that the "amenities available in the residence of a defendant would cause home detention to not be sufficiently punitive," it is permitted to "limit the amenities available."[15]

We ask the Court to consider these alternatives to incarceration when fashioning a sentence that is sufficient but not greater than necessary. 18 U.S.C. § 3553(a)(2).

---

[12] *United States of America v. David Shamilzadeh,* 04-Cr-194 (JG), United States District Court, Eastern District of New York.

[13] Darren Gowan, "Overview of the Federal Home Confinement Program," *Federal Probation,* p. 11 (December 2000).

[14] *Id.*

[15] U.S.S.G. § 5F1.2, Application Note 2.

### 4. The Need To Avoid Unwarranted Sentencing Disparities Necessitates A Sentence Substantially Below the Advisory Guidelines Range 3553(a)(6)

As stated previously, David's applicable Guideline range is 63 to 78 months. One important factor that this Court must consider in determining the appropriate sentence is "the need to avoid unwarranted sentenc[ing] disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Although the circumstances of David's crime are atypical and unique, there are a number of other defendants found guilty of similar rogue trading activities against whom a reasonable comparison can be made and, when those comparisons are undertaken, they reveal that a sentence significantly below the Guidelines range for David is warranted.

First, the matter most worthy of comparison is *United States v. Evan Brent Dooley*, 10-Cr-335-1 (N. Dist. Ill. filed April 27, 2010) (hereafter "*Dooley*."). In *Dooley*, the defendant was a commodities trader working for MF Global, a major global financial derivatives broker. Similar to David, over the course of one day of trading, Mr. Dooley made unauthorized trades and caused MF Global to incur a trading loss in excess of $140 million. Although Mr. Dooley pleaded to two counts of violating 7 U.S.C. §§ 6a and 13(a)(5), for trading in excess of speculative futures position limits as established by the Commodity Futures Trading Commission, rather than wire fraud or securities fraud (as David did), Mr. Dooley stipulated in his plea agreement that his conduct constituted an artifice to defraud MF Global by means of materially false and fraudulent pretenses, representations, and promises. (*Dooley*, Dkt. Entry No. 57, Gov't Position Paper as to Sentencing Factors, pp. 1, 3). Thus, the crux of the conduct by both Mr. Dooley and David was strikingly similar.

Mr. Dooley's plea agreement provided for a sentence cap of 120 months. (*Id.* at p. 1). The Government requested that the Court sentence Mr. Dooley to the maximum 120 months allowable under the agreement (and the statutory maximum). The Court, however, determined that a sentence of 60 months, one half of the Guidelines level, was "sufficient but not greater than necessary" to satisfy the sentencing objectives set forth in 18 U.S.C. § 3553(a)(2).

While in no way minimizing the serious nature of David's actions, the conduct by Mr. Dooley (which the Court determined was appropriate for a fifty percent variance from the Guidelines) was even more severe. First, Mr. Dooley's losses were $140 million – substantially greater than Rochdale's losses. Second, although MF Global did not cease operations due to the trade, its stock price dropped 42% in the ensuing two days after the trade. (*Dooley*, Dkt. Entry No. 57, Gov't Position Paper as to Sentencing Factors, at p. 9). In fact, Moody's Investor Service downgraded MF Global Holdings Ltd.'s credit from A3 to Baa1, and Fitch's Ratings assigned a "Negative Watch" after the Dooley trade. In addition, MF Global had to pay $40 million to settle class action lawsuits and a $10 million SEC fine for poor risk management practices as a result of Mr. Dooley's trade. (*Id.* at p. 10.) Finally, with respect to Mr. Dooley individually, the Government pointed out that he had undertaken unauthorized trades one month before the incident, was arrested numerous times previously for reckless driving (in one instance while possessing a loaded .38 caliber pistol with two loaded magazines, and an open cup of alcohol) and, according to the Government, was portrayed in his Pre-Sentence Report as having been "self-indulgent" and "indifferent to the well-being of others."

In contrast, while David's conduct has led to substantial monetary losses, they are significantly less. And, as set forth time and again in the letters of support, David is far from indifferent to the well-being of others. Finally, and perhaps most importantly, unlike Mr. Dooley, David has the benefit of a motion made by the Government for a sentence *below* the advisory Guidelines range pursuant to § 5K1.1.

A second matter is *United States v. Matthew Taylor*, 13-Cr-251 (S.D.N.Y. filed March 28, 2013) (hereafter *Taylor*). In *Taylor*, the defendant was charged with a single count information for violating 18 U.S.C. §1343 (Wire Fraud). (*Taylor* Dkt. Entry No. 2, at p. 1). His rogue trading activities occurred over the course of one day, and in the aftermath, he repeatedly lied and mislead his employer, Goldman Sachs & Co. ("Goldman"), when the trades were investigated. As a result of Mr. Taylor's actions, Goldman incurred a trading loss of $118.4 million. (*Id.* at p. 7, ¶ 15). In 2007, the year in which he undertook the trades, Mr. Taylor earned $150,000 and was expecting a bonus of $1.6 million. (*Id.* at p. 2, ¶ 3). As he admitted in his plea, he undertook the trades in order to augment his reputation at Goldman and increase his performance based compensation.[16] Although his conduct was similar to David's (and with losses more than twenty times those caused by David), Mr. Taylor is to be sentenced based upon his compensation ($1.75 million), rather than the loss amount ($118 million). Of course, as with this Court, the sentencing Judge in Mr. Taylor's case will not be bound by the Guidelines range when Mr. Taylor is ultimately sentenced, nevertheless it is worth noting that Mr. Taylor's Guidelines range is expected to be 33 to 41 months (with an offense level of 20). *Id.*

---

[16] Chad Bray and Justin Baer, *Ex-Trader Admits to Fraud*, Wall Street Journal, April 4, 2013, at C3. This article can also be viewed on the web at:
http://online.wsj.com/article/SB10001424127887324600704578400332210938670.html

A third matter, although more than ten years old, is also worthy of comparison. In *United States v. John M. Rusnak*, 02-Cr-280 (Dist. Md. filed June 5, 2002) (hereafter "*Rusnak*,") the defendant was a trader at Allied Irish Banks PLC. He engaged in unauthorized trades over the course of several months (as opposed to one day) and ultimately caused losses to the bank of $691 million (almost 35 times the losses caused by David).[17] (*Rusnak*, Dkt. Entry No. 13, Judgment).[18] Mr. Rusnak was sentenced to 90 months. Mr. Rusnak did not receive a recommendation for a § 5K1.1 departure from the Government. Despite the more egregious nature of Mr. Rusnak's conduct, if this Court were to sentence David within the Guidelines range argued by Probation as applicable to him, he could get a sentence the same length as Mr. Rusnak despite (1) cooperation; (2) a much lower loss amount and (3) a fraud committed in one day rather than over a longer time period as with Mr. Rusnak.[19] Accordingly, while the comparison is not as clean as it is with *Dooley* and *Taylor*, a comparison of David's circumstances with those in *Rusnak* also reveals that a substantial departure below the Guidelines range would be appropriate in this case.

Although not sentenced in American courts, several high-profile "rogue traders" in the past several years have been given sentences that were significantly lower than David's Guidelines range. For example, UBS trader Kweku Adoboli, who was convicted for rogue trades that resulted in $2.3 billion in losses -- the biggest in British history -- was sentenced to a seven year sentence (of which he will serve half under British law).[20]

---

[17] This assumes a loss amount for David even at the high end of $20 million.

[18] See http://online.wsj.com/article/SB1012991042190203640.html; see also, http://en.wikipedia.org/wiki/John_Rusnak

[19] We acknoweldge, however, that Mr. Rusnak's sentence was imposed prior to *United States v. Booker*, 543 U.S. 220 (2005) and after the U.S.S.G. § 2B1.1 loss amount table had been amended pursuant to Sarbanes-Oxley.

[20] http://www.nbcnews.com/business/former-ubs-trader-adoboli-sentenced-seven-years-fraud-1C7172741

In addition, Societé General trader Jerome Kerviel caused losses of $6.71 billion and received a three year sentence by a French Court.[21]

Moreover, while the comparison to an uncharged co-conspirator is not, in and of itself, required by the plain meaning of 18 U.S.C. § 3553(a)(6), which seeks to avoid unwarranted disparities between "defendants with similar records who have *been found guilty of* similar conduct," (emphasis added), such a comparison is consistent with the spirit of that statute.[22]  In the grand scheme of fairness and justice, it is suggested that this Court consider the fact that the mastermind behind the scheme -- the individual who approached David and convinced him that the illegal plan was likely to work and worth the risk to others -- has not been charged.  Indeed, Sender's life will apparently go on uninterrupted despite the chain of events that he set into motion.  When determining an appropriate sentence, we ask that the Court consider the disparity between the prison sentence for David and the absence of any criminal charges -- or even regulatory charges (much less a prison sentence), that will inure to the detriment of Harlan Sender.

Finally, the Second Circuit has made clear that 18 U.S.C. § 3553(a)(6) "requires a district court to consider *nationwide* sentence disparities.  *United States v. Frias*, 521 F.3d 229, 236 (2nd Cir. 2008) (emphasis added) *citing United States v. Willis*, 476 F.3d at 109-111.  Although a nationwide comparison of fraud cases poses a challenge since each case has a myriad of specific, individual differences (e.g. loss amount (U.S.S.G. § 2B1.1), supervisory role enhancements (U.S.S.G. § 3B1.1) obstruction of justice enhancement(U.S.S.G. § 3C1.1), etc.); nonetheless, a view of the "Report on the

---

[21] http://online.wsj.com/article/SB10001424052748703726404575533392217262322.html

[22] The Second Circuit has stated, "[w]e do not, as a general matter, object to district courts' consideration of similarities and differences among co-defendants when imposing a sentence."  *United States v. Willis*, 476 F.3d 103, 110 (2d Cir. 2007).

Continuing Impact of United States v. Booker on Federal Sentencing," as published by the United States Sentencing Commission in December 2012 (hereafter the "*Booker* Report) is instructive.[23]   The *Booker* Report reveals that for the period December 11, 2007 through September 20, 2011, the national Guideline minimum sentence was 30 months and the average sentence for defendants convicted of fraud, who received a Government sponsored below Guidelines sentence pursuant to § 5K1.1, was 17 months. (*Booker* Report, Part C: Fraud Offenses, at p. 9).   The average Government sponsored 5K1.1 departure was 60 percent below the Guideline minimum.   These national statistics further show that a substantial downward departure in this matter is warranted to be consistent with national sentences imposed against other defendants convicted of fraud offenses.

**5.      The Need For Restitution (3553(a)(7))**

David will have a restitution Order against him in a sum greater than $5 million. While admittedly it is unlikely he will ever be able to pay this sum back in full to the victims of his conduct, he will surely be ordered to pay some portion of his earnings to the victims in restitution for the rest of his life.   Clearly, the sooner he is employed and actively in the work force, the sooner he can begin making payments to his victims.

**IV.     <u>CONCLUSION</u>**

In conclusion, the degree of punishment that David has already suffered cannot be understated.   The emotional and financial hardship he has caused his victims, himself and his family as a result of his conduct is enormous.   Unfortunately, David and those around him know that damage cannot be undone.   As Kristen states in her letter: "When I first

---

[23]   The *Booker* Report can be found at:
http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Booker_Reports/2012_Booker/index.cfm

spoke to my 9 year old about this, I explained to her that Daddy made a mistake in business and that he lost his company a lot of money.  Her response was 'that's why God made erasers.'  I wish it were that simple but, sadly, it is not."  (Letter of Kristen Miller at p. 7, Ex 48).  Thus, both David and his family accept that the Court must punish him for what he did on October 25, 2012.  Nevertheless, for all the reasons set forth above, we submit that a significant departure downward from the advisory Guidelines range under these circumstances is warranted and respectfully urge the Court to impose such a sentence.  Most importantly, as set forth in the many pleas made on David's behalf, we ask that this Court render justice with as much compassion and mercy as it can afford, and impose a sentence that is just, fair and appropriate -- one that is sufficient but not greater than necessary -- and allows David to again become a productive, contributing member of both his family and society at large, as soon as possible.

Dated: New York, NY
       November 8, 2013

                            Respectfully Submitted,

                            /S/ Kenneth C. Murphy
                                Kenneth C. Murphy
                                (ct29130)
                            Simon & Partners LLP
                            The French Building
                            551 Fifth Avenue
                            New York, NY 10176
                            (212) 332-8900
                                *Of Counsel*:
                            Bradley D. Simon
                            Brian D. Waller
                            Jonathan Stern
                            (Not admitted in Connecticut)