UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Crim. No. 3:13CR75 (RNC) |
| | : | |
| DAVID MILLER | : | November 15, 2013 |

**GOVERNMENT'S RESPONSE MEMORANDUM IN AID OF SENTENCING**

DEIRDRE M. DALY
ACTING UNITED STATES ATTORNEY

PAUL A. MURPHY
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct26654
United States Attorney's Office
1000 Lafayette Blvd., 10th Floor
Bridgeport, Connecticut 06604
(203) 696-3000

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

GOVERNMENT'S RESPONSE MEMORANDUM IN AID OF SENTENCING........................ 1

BACKGROUND ................................................................................................................ 3

    The Apple Trade at Rochdale ..................................................................................... 3

    The Fraudulent Hedge Transaction............................................................................. 6

DISCUSSION .................................................................................................................... 8

    I. The Court Must Consider the Guidelines and the Other § 3553(a) Factors ........................... 8

        A.The Applicable Sentencing Guidelines Range.................................................................. 9

            1.   The Court Should Apply the Government's Guidelines Calculation. ........................ 10

            2.   The Court Should Not Apply the Enhancement Identified by Probation.................. 13

        B.The Court Should Reject the Defendant's Guidelines Departure Arguments.................. 15

            1.   The Court Should Reject the Defendant's Argument for a Downward Departure Because of the Cumulative Effect of Overlapping Enhancements............................ 15

            2.   The Court Should Reject the Defendant's Claim that the Offense Level Substantially Overstates the Seriousness of the Offense................................................................ 17

        C.The Factors in 18 U.S.C. § 3553(a) Call for a Substantial Term of Imprisonment. ......... 19

            1.   The Nature and Seriousness of the Offense Call for a Significant Prison Sentence as a Just Punishment and in an Effort to Promote Respect for the Law. ........................... 21

            2.   The Court's Sentence Should Reflect the Need for Specific and General Deterrence. ................................................................................................... 24

            3.   The History and Characteristics of the Defendant.................................................... 27

    II. The Mandatory Victim Restitution Act Requires that the Court Enter an Order of Restitution............................................................................................... 30

    CONCLUSION........................................................................................................... 31

i

TABLE OF AUTHORITIES

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ................................................................ 8, 9

*Kimbrough v. United States*, 552 U.S. 85 (2007) ....................................................... 8,9

*Rita v. United States*, 551 U.S. 338   (2007) ......................................................... 9, 20

*United States v. Adelson*, 441 F. Supp.2d 506 (S.D.N.Y. 2006) ............................ 17, 18

*United States v. Amato*, 540 F.3d 153 (2d Cir. 2008) .................................................. 31

*United States v. Battista*, 575 F.3d 226 (2d Cir. 2009) ........................................... 29, 30

*United States v. Boccagna*, 450 F.3d 107 (2d Cir. 2006) ............................................. 30

*United States v. Booker*, 543 U.S. 220 (2005) ......................................................... 8, 9

*United States v. Bryant,* 128 F.3d 74 (2d Cir.1997) ..................................................... 13

*United States v. Canova*, 485 F.3d 674 (2d Cir. 2007) ................................................. 19

*United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005) ............................................... 8, 9

*United States v. DeCecco*, 467 Fed. Appx. 85 (2d Cir. 2012) ...................................... 19

*United States v. Ekanem*, 383 F.3d 40 (2d Cir. 2004) .................................................. 30

*United States v. Fernandez*, 443 F.3d 19 (2d Cir. 2006) ................................................ 9

*United States v. Fernandez*, 877 F.2d 1138 (2d Cir. 1989) ........................................... 14

*United States v. Germosen*, 139 F.3d 120 (2d Cir. 1998) ............................................. 30

*United States v. Gowing*, 481 Fed. Appx. 1 (2d Cir., June 6, 2012) .............................. 13

*United States v. Jackson*, 346 F.3d 22 (2d Cir. 2003) .................................................. 14

*United States v. Johnson*, 378 F.3d 230 (2d Cir. 2004) ................................................ 30

*United States v. Koch*, 2012 WL 1994704 (S.D.N.Y., June 4, 2012) ............................ 16

*United States v. Lauersen*, 362 F.3d 160 (2d Cir. 2004) .............................................. 14

*United States v. Livesay*, 587 F.3d 1274 (11th Cir. 2009) ............................................................ 25

*United States v. Regensberg*, 635 F. Supp.2d 306 (S.D.N.Y. 2009 ........................................ 24, 28

*United States v. Rigas,* 583 F.3d 108 (2d Cir.2009) .................................................................... 13

*United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007) ............................................................ 18

*United States v. Stein*, 2010 WL 678122 (E.D.N.Y., Feb. 25, 2010) ........................................ 25

*United States v. Ture*, 450 F.3d 352 (8th Cir. 2006) .................................................................... 25

**Statutes**

18 U.S.C. § 371 ............................................................................................................................ 3

18 U.S.C. § 1343 .......................................................................................................................... 3

18 U.S.C. § 3553(a) ............................................................................................................. *passim*

18 U.S.C. § 3663A ...................................................................................................................... 30

18 U.S.C. § 3664 ........................................................................................................................ 29

**Sentencing Guidelines**

U.S.S.G. § 2B1.1 ................................................................................................................. *passim*

U.S.S.G. § 5E1.1 ........................................................................................................................ 30

U.S.S.G. App. C, Amendment 653 .................................................................................... 14, 16

**Other Authorities**

Elizabeth Szockyj, "Imprisoning White-Collar Criminals?", from "Symposium: A Fork in the
    Road Build More Prisons or Develop New Strategies to Deal with Offenders," 23 S.Ill.U.L.J.
    485 (1999) ........................................................................................................................... 26

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Crim. No. 3:13CR75 (RNC) |
| | : | |
| DAVID MILLER | : | November 15, 2013 |

### GOVERNMENT'S RESPONSE MEMORANDUM IN AID OF SENTENCING

On October 25, 2012, David Miller carried out an audacious plot that had been in the works for months to purchase almost $1 billion of Apple Inc. ("Apple") stock with the hope of profiting personally from the proceeds of the trade by selling it after Apple announced its earnings at the end of the day.    He lied to his employer, Rochdale Securities LLC ("Rochdale"), by claiming that the trade was being done for a client, when he knew that it was part of a scheme cooked up between himself and the customer's representative whereby they would enjoy what they hoped would be the outsize profits from the trade, but would leave the risk of loss with Rochdale if the trade went bad.    After Apple announced its quarterly earnings later that day, the stock price dropped, leading to disastrous consequences for Rochdale.    The fraudulent trade caused Rochdale to sustain almost $5.3 million dollars in trading losses, and the collateral it posted with its clearing broker was seized and sold fire sale prices.    Regulatory requirements prohibited it from continuing to trade securities, which led directly to its cessation of all business operations.    The defendant's fraud scheme also exposed another broker-dealer to significant potential losses (which fortunately did not materialize).

The defendant has filed a lengthy sentencing memorandum focusing largely on his personal history and characteristics as well as the financial motivation for this crime.   The memorandum is long on his self-inflicted financial wounds and seeks to tug at the heartstrings when discussing his upbringing in a single-parent home and what are described as his various good works over the years.   Missing from the submission, however, is a real appreciation for the devastation he caused to Rochdale and its owners and employees.   What should not get lost is that overnight Rochdale went from being a respected broker-dealer with about three dozen registered representatives and employees, to being on life support and ultimately surrendering its broker-dealer license.   Millions were lost immediately as a consequence of the defendant's rogue trade being unwound, with millions more being lost when the clearing broker forced the sale of Rochdale's illiquid collateral over the weekend that Hurricane Sandy lashed the tri-state area.   As noted, all trading was promptly suspended as a result of the violation of the net capital requirements, depriving Rochdale of its lifeblood.   While its owner scrambled to line up a capital infusion to save his business, Rochdale's traders began heading for the exits so as to be able to earn a living elsewhere.   The slow and very public demise of Rochdale followed on the heels of the trading ban, as the prospects of the search for a white knight to rescue the firm grew dimmer by the day.   The firm then lost its marquee name when superstar bank analyst Dick Bove left amidst the struggles caused by the defendant's conduct.   Eventually, Rochdale was forced to close its doors and surrender its broker's license.   And its principal owner, a successful participant in Wall Street securities world with a lengthy track record, was left with the losses caused by the defendant and the need to rebuild his own professional life.

All of this resulted from the defendant's conscious decision to put his personal financial interests above those of colleagues, co-workers, friends and his former employer.    All told, the defendant inflicted grievous harm on Rochdale and used a former friend to expose yet another broker-dealer to the possibility of substantial losses, all for the chance to hit it big on an ill-conceived, get-rich-quick scheme.    This is why the Court will be sentencing David Miller on November 19, 2013.    The very serious nature of the offense conduct combined with the harm caused to Rochdale should result in a substantial sentence of imprisonment here.[1]

## BACKGROUND

David Miller pled guilty on April 15, 2013 to one count of conspiracy to commit securities fraud and wire fraud, in violation of 18 U.S.C. § 371, and one count of wire fraud, in violation of 18 U.S.C. § 1343, arising out of the unauthorized Apple stock trade.

### The Apple Trade at Rochdale

Defendant Miller had worked as an institutional sales trader at Rochdale in Stamford, Connecticut, since 2009.    While there, Miller covered the account of a proprietary trading firm in New York (the "Customer").    One of Miller's contacts at the Customer was a trader who will be referred to herein as "Trader A."    Miller and Trader A communicated regularly through instant messages and emails, and periodically they would get together for drinks at a bar in Manhattan.    Over the course of various meetings, they agreed to engage in unauthorized trading in Apple stock in an effort to capitalize on the volatility of the stock immediately after Apple's quarterly earnings announcement.    The illicit agreement provided that, through a series of misrepresentations, the conspirators would share in any profits from their unauthorized trading

---

[1] The government is filing this response sentencing memorandum as well as a separate sealed motion and memorandum, and asks the Court to consider the entirety of the government's submissions in fashioning an appropriate sentence in this case.

without taking on any of the risk themselves.    Rather, the risk of loss would be with Rochdale – Miller's employer.

The plan was for Trader A to submit an order to Miller to buy or sell Apple stock prior to Apple's announcement of its quarterly earnings, and Miller would intentionally execute a multiple of 1,000 times what was in the written order.    If the stock moved in the direction the conspirators anticipated, then they would unwind the position in the after-hours trading market and divide the profits.    If, on the other hand, the price went in the wrong direction, Trader A would claim that he had not ordered the higher volume and Miller would claim he had made a mistake.    In that circumstance, Rochdale, as Miller's employer, would be left to deal with the loss.

In July 2012, the conspirators made their first effort to execute the plan.    Apple was scheduled to announce its quarterly earnings after the market closed on July 24, 2012.    Early that morning, Trader A forwarded to the defendant an email he had received the previous day from the Customer's compliance department, which noted that an examiner from the self-regulatory organization governing the Customer, namely, the Philadelphia Stock Exchange, would be at the Customer's offices on July 24th and 25th of 2012.    Trader A forwarded this internal email to the defendant at around 8:02 a.m. on July 24, 2012, and added a note that read, "[T]his may present a problem."    Later in the day, at around 12:05 p.m., Trader A submitted an order to Miller for execution which read: "sell 125 per half an hour - aapl."    "AAPL" is the ticker symbol for Apple.    The defendant was supposed to use this order as the purported basis for the rogue trade, but he got cold feet and did not execute it.    After Apple announced its earnings later that day, the stock moved in the direction Trader A had predicted, such that the

4

trade would have been profitable had Miller executed it according to plan.    The following morning, July 25, 2012, at about 5:32 a.m., Trader A blind copied the defendant on an email the subject line of which read simply, "6 AAPL reports – count 'em!" The email reflects that it had a number of electronic attachments which appear to have been analyst reports relating to Apple.

At their next meeting, Trader A reassured the defendant that the scheme would work the next time Apple announced its earnings, and the conspirators agreed to try executing on the plan again the following quarter.    Apple was next scheduled to announce its earnings after the market closed on October 25, 2012.    At around 9:31 a.m. that day, Trader A submitted an order for Apple that read simply: "b 125 ok (per 1/2 hr)."    Part of the scheme was for the order to be worded in this fashion to provide both conspirators with plausible deniability.    After receiving the order, Miller promptly began executing orders to buy 125,000 shares of Apple stock every half hour.    Over the course of the day, the defendant entered multiple, separate orders in Rochdale's order management system in the amount of 125,000 shares.    Each such order was placed from Rochdale's offices in Stamford, Connecticut, and was executed through various trading platforms to which Rochdale had access, including a system that gave Rochdale direct electronic access to the market in New York.    All of the buy orders for Apple stock that the defendant executed over the course of October 25, 2012 were done ostensibly for the account of the Customer.    But, as the defendant well knew, the scheme was designed so that Rochdale, rather than the Customer, would bear the risk of loss if Apple's stock price dropped as a result of its upcoming earnings announcement.

After Apple announced its earnings later that day, the stock price began dropping and it became clear that the trade would not be profitable.    Pursuant to the pre-determined plan,

5

Trader A caused the Customer to deny having ordered anything beyond 1,625 shares of Apple, and Miller claimed he had made a mistake.    As such, Rochdale was left holding approximately 1,623,375 shares of Apple with a cost of almost $1 billion at a time when the stock price was declining as a result of the earnings announcement.    Rochdale traded out of the position the next day, incurring a trading loss of approximately $5,292,202 on the trade.

### The Fraudulent Hedge Transaction

Defendant Miller also separately decided to hedge the rogue Apple trade by attempting to sell the stock short through another firm.    Specifically, a week or so before October 25, 2012, Miller tried to set up a trading relationship with a company that will be referred to herein as "Broker #1."    He contacted someone there he had known for years and falsely told the friend that he was leaving Rochdale and would be going to the buy side at an entity that will be referred to herein as "Firm A."    Miller falsely claimed that he wanted to open an account at Broker #1 on behalf of Firm A so that he could begin trading.    In reality, Miller had no relationship with Firm A, had not been hired by Firm A, and had no authority to be opening accounts in its name or trading on its behalf.    Nevertheless, based on Miller's misrepresentations to his friend, Broker #1 agreed to open the account in the name of Firm A so that Miller could trade.    Broker #1 pushed Miller for contact information for people in the back office of Firm A to verify information needed for the formal account opening documentation.    Miller was able to put off Broker #1's request for a while, and eventually, upon Broker #1's insistence, he gave them bogus contact information.

While he was stalling Broker #1 about the back-office contact information for Firm A, Miller convinced Broker #1 to sell 500,000 shares of Apple stock, purportedly on behalf of Firm

A.   He falsely advised Broker #1 that he was selling stock that Firm A owned, thereby hiding the fact that he was in essence shorting the stock.   Broker #1 acted on Miller's misrepresentations and sold 500,000 shares of Apple.   Miller's plan eventually fell apart.   That evening, Broker #1 realized that Miller had been lying about his relationship with Firm A and that it was holding a short position of approximately 500,000 shares of Apple.   Although Broker #1 bore the risk of loss on this position, it was able to trade out of the position at a small profit because Apple's stock price dropped after the earnings announcement.

As a direct result of Miller's fraud, Rochdale suffered a trading loss of $5,292,202 and eventually was driven out of business.   According to Rochdale's management, its losses also included the loss in value of the collateral it had posted with its clearing broker, Pershing LLC. Specifically, Rochdale management has advised that in order to cover the trading loss, Pershing seized Rochdale's collateral and sold it over the weekend that Hurricane Sandy hit the tri-state area, resulting in the collateral being sold at a steep discount.   Moreover, the trading loss caused Rochdale to be in violation of its net capital requirements.   As a consequence, Rochdale's trading activity was suspended, which had the effect of depriving it of the vast majority, if not all, of its revenues.   Rochdale's management sought a capital infusion for months, but was unable to find an interested investor.   All of Rochdale's traders eventually left the firm, and Rochdale was eventually forced to give up its broker-dealer license.   The government takes the position that the loss resulting from the offense of conviction -- including the trading loss, the loss of the value of the collateral posted with Pershing, and the lost value of Rochdale's business enterprise -- is greater than $7 million but not more than $20 million.

7

The defendant admitted his guilt and expressed remorse for his conduct promptly after his attorney was contacted by the government several weeks after the events in question.   The government obtained an arrest warrant for the defendant in early December 2012 and he self-surrendered to the FBI on December 4, 2012.

D<small>ISCUSSION</small>

**I.      The Court Must Consider the Guidelines and the Other § 3553(a) Factors**

In *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Second Circuit explained that, in light of *United States v. Booker*, 543 U.S. 220 (2005), district courts should engage in a three-step sentencing procedure.   First, the district court must determine the applicable Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence."   *Crosby*, 397 F.3d at 112. Second, the district court should consider whether a departure from that Guidelines range is appropriate.   *Id.*   Third, the court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose.   *Id.* at 112-13. While the Guidelines are advisory only after *Booker*, that fact does not reduce them to "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."   *Crosby*, 397 F.3d at 113.   Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings.   *Id.* at 49; *Kimbrough v. United States*, 552 U.S. 85, 107 (2007).   The Second Circuit has "recognize[d] that in the

8

overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough*, 552 U.S. at 89 ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'") (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).

The Supreme Court confirmed that "the Guidelines are not the only consideration, however." *Gall*, 552 U.S. at 49.   Instead, the district court must consider all the factors set forth in § 3553(a), and "make an individualized assessment based on the facts presented." *Id*. at 50.   If the sentence selected is outside the Guidelines, the sentencing court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id*.   Ultimately, a district court's sentence is reviewed for reasonableness.   *See Booker*, 543 U.S. at 260-61; *Crosby*, 397 F.3d at 114-15.

## A.  <u>The Applicable Sentencing Guidelines Range</u>

Probation calculated the guideline range to be 121 to 151 months of imprisonment.   *See* Presentence Report ("PSR") ¶62.   The government believes that the appropriate guideline range to apply here is 78 to 97 months of imprisonment.   The difference between the two calculations stems from the fact that Probation identified a four point enhancement under U.S.S.G. § 2B1.1(b)(15)(B)(i).   PSR ¶63.   Meanwhile, the defendant contends that the guideline range should be 63 to 78 months of imprisonment.   The difference between this and the government's calculation stems from the fact that the defendant contends that the losses should be cabined to the approximately $5.3 million trading loss, as he claims that the government will be unable to

9

prove by a preponderance of evidence the higher loss amount.   *See* Defendant's Sentencing

Memorandum at 22-23 ("Def. Mem.").   For the reasons set forth below, the Court should apply

the government's guideline range.

### 1.   <u>The Court Should Apply the Government's Guidelines Calculation.</u>

The range of 78 to 97 months is based on the following calculations:   The base offense

level for the offenses of conviction is 7.   *See* U.S.S.G. § 2B1.1(a).   Twenty levels are added to

this because the loss amount of more than $7 million but not more than $20 million.   *See*

U.S.S.G. § 2B1.1(b)(1)(K).   The parties agree that the defendant is subject to a four-level

enhancement under the Guidelines because the offenses involved violations of the securities laws

and the defendant was a person associated with a broker or dealer.   *See* U.S.S.G. §

2B1.1(b)(18)(A).   With three levels off for acceptance of responsibility, the total offense level

is 28.   When combined with a Criminal History Category I, the applicable sentencing range is

78 to 97 months in prison.

The parties disagree on the question of loss.[2]   The Guidelines provide that loss is the

greater of actual or intended loss.   *See* U.S.S.G. § 2B1.1, comment. (n.3(A)).   This case

involves actual loss, rather than intended loss, and as the Court is well aware, "actual loss" under

the Guidelines "means the reasonably foreseeable pecuniary harm that resulted from the

offense."   U.S.S.G. § 2B1.1, comment. (n. 3(A)(i)).   The loss number used by the government

---

[2] The defendant initially did not object to the loss calculation of more than $7 million but not more than $20 million.
*See* Letter of Kenneth C. Murphy to U.S. Probation, dated October 21, 2013.   In his sentencing memorandum,
however, the defendant takes issue with the higher loss calculation.   *See* Def. Mem. 22-23. The government has no
objection to the Court's consideration of the defendant's otherwise late objection at this time.   In light of the
defendant's objection, the government has sought additional information to support its loss numbers.   It has supplied
Probation with a copy of the FBI interview report relating to the May 2013 interview of the owner of Rochdale.   The
government also received documents from Rochdale on November 14, 2013 and continues to examine those materials.
The documents have been submitted to the defense and to Probation.

is based on a trading loss of $5,292,202, plus an estimate of (a) the losses inflicted on Rochdale as a result of the need to sell collateral it had posted with its clearing broker, Pershing LLC, and (b) the loss of the value of the business as a result of the inability to trade and the ultimate decision by Rochdale to surrender its broker-dealer license.

On November 14, 2013, Rochdale supplied a valuation it had done of the collateral posted with Pershing.   The valuation was done by New Oak Solutions, LLC and a copy has been supplied to Probation and the defense.   It notes that the fair market value of those illiquid securities was approximately $8.8 million.   According to Rochdale, Pershing seized the collateral the week of the Apple trade and sold it to a bidder from Florida at something approaching a liquidation value for only $3.3 million, causing another $5.5 million in loss.

The Court should consider the circumstances under which the collateral posted with Pershing was sold and include the reduced value of the collateral as part of the trading losses sustained as a result of the Apple trade.   The collateral consisted of illiquid securities such as collateralized debt obligations for which there is no daily pricing.   To obtain fair value for these likely would have required an auction through appropriate dealers in the securities community. Instead, according to Rochdale, Pershing simply seized the collateral and sold it to someone in Florida who put in a low bid.   This occurred while the damage from Hurricane Sandy caused most, if not all, of the market participants at the large New York investment houses to be unavailable.   Thus, the sale of the collateral by Pershing under these circumstances is properly viewed as a forced sale, and not representative of fair market value.   The notion that a fair market value could be assigned to such illiquid securities when sold almost overnight under those conditions does not make much sense.   It was more likely that an opportunistic buyer

simply snatched them up under circumstances more closely associated with a liquidation sale. Indeed, even if the Court were to cut in half New Oak's valuation of the pledged securities, the lost value would still exceed $1 million.

Rochdale also has supplied documents in which it values the business enterprise at over $20 million based on a percentage of revenues and a discounted cash flow model.   These numbers are inherently uncertain, of course.   But it stands to reason that a company such as Rochdale had value as a going concern prior to the time of the Apple trade at the center of this case.   Of course, no buyers ever came to Rochdale's rescue, so there is no sale price to use as a fair market value for the company.   Common sense dictates that the inability to find a buyer was due in large measure to the fact that, as a consequence of the defendant's actions, no one would have been interested in sinking money into a company that had been publicly branded in the media.   Nor does it make sense that any buyer would want to infuse capital into such an enterprise after the defendant's conduct, especially as it would require sufficient capital to make up the net capital requirements and to post new collateral with a clearing broker.

The Court plainly should look to the value of this company prior to the fraudulent trade. Even assuming the above-referenced valuations are overstated because of diminishing revenues of the company, the fact remains that this company had value prior to the ill-fated trade. Indeed, Rochdale's unaudited income statement for the year ending December 31, 2012 shows net income was almost at break even if the losses incurred by the Apple trade are removed. And those numbers do not include more than two months at the end of the year when Rochdale was unable to earn any income from trading because of the net capital violation.   The company also had millions of dollars of member equity as of December 31, 2011.   That equity was wiped

12

out by December 31, 2012 -- two months after the defendant executed his scheme.

In short, even under a highly conservative view of Rochdale's numbers, the losses here would exceed $7 million (although the government does not advocate for losses exceeding $20 million).   "In calculating the amount of loss under the Guidelines, a sentencing court 'need only make a reasonable estimate of the loss.'" *United States v. Rigas,* 583 F.3d 108, 120 (2d Cir.2009) (quoting U.S.S.G. § 2B1.1 cmt. n. 3(C)); *see United States v. Bryant,* 128 F.3d 74, 75 (2d Cir.1997) ("[T]he Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision.").

It is fair indeed to conclude, in these circumstances, that given the sheer size of the unauthorized trade, which resulted in the purchase of close to $1 billion dollars of Apple stock, it was reasonably foreseeable to a licensed securities trader at a firm of Rochdale's size that any collateral would have to be sold and sold quickly.   By its nature, a quick sale of illiquid assets like the collateralized debt obligations Rochdale had posted with Pershing would be done at below-market prices.   Similarly, it was reasonably foreseeable to a securities trader that Rochdale would be in violation of the applicable net capital requirements as a result of having to make good on a trade of this magnitude, leading directly to the deprivation of any revenues from trading activity.   *See United States v. Gowing*, 481 Fed. Appx. 1, *3 (2d Cir., June 6, 2012) (there was no clear error in finding loss was reasonably foreseeable to defendant).   As such, it is proper for this Court to include these losses in the Guidelines loss calculation.

## 2.   The Court Should Not Apply the Enhancement Identified by Probation.

As the Court is aware, Probation identified a further four-point enhancement under U.S.S.G. § 2B1.1(b)(15)(B)(i) because the offense substantially jeopardized the safety and

13

soundness of a financial institution.    PSR ¶ 63.    This enhancement was not contemplated by the plea agreement, nor does it appear that it should be applied under these circumstances.    The government's loss calculation includes amounts attributable to the loss of the business enterprise, and those losses are largely responsible for a two-level increase in the offense level. Accordingly, there is a potential for some degree of double counting in this situation.    *See United States v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004); *United States v. Jackson*, 346 F.3d 22, 25-26 (2d Cir. 2003).    Moreover, as identified by the defendant in his memorandum, the application of this enhancement to a "financial institution" such as Rochdale, while technically within the definition in the Guidelines, seems misplaced.    The Guidelines enhancement was developed principally to protect the banking system, a concern that is not implicated in this particular situation.    *See* U.S.S.G. App. C, Amendment 653.

If the Court nevertheless were to conclude that the enhancement should apply, then the government requests that the Court depart downward under *United States v. Fernandez*, 877 F.2d 1138 (2d Cir. 1989), to give effect to the terms of the plea agreement.    *Id*. at 1145.    The Court should, of course, consider the fact that the defendant's conduct led to the downfall of a broker-dealer as a significant reason for a substantial prison sentence in this case, as noted in greater detail below.    The government simply is not advocating for this enhancement under the Guidelines, given the plea agreement and the loss figure that should be applied here.

Accordingly, the applicable guideline range for the Court to use as the appropriate starting point from which to fashion an appropriate sentence is 78 to 97 months of imprisonment.

**B.  The Court Should Reject the Defendant's Guidelines Departure Arguments.**

The defendant argues for the application of a guideline range of 63 to 78 months, and then proceeds to seek multiple downward departures under the Sentencing Guidelines.    Several of these arguments are addressed in the government's sealed memorandum.    Here, the government responds to two of them:    First, the Court should not depart downward because of so-called overlapping enhancements.    Second, the Court should deny the request that it find that the guideline range substantially overstates the seriousness of the offense.    Neither argument withstands scrutiny.

**1.    The Court Should Reject the Defendant's Argument for a Downward Departure Because of the Cumulative Effect of Overlapping Enhancements.**

The defendant asks the Court to depart downward on the ground that the cumulative effect of various enhancements would "cause an extreme and disproportionate increase" in the high end of the defendant's sentencing range.    Def. Mem. 28.    The cumulative enhancements he complains of are (1) a potential loss of between $7 million and $20 million, (2) a four-level enhancement for by an offender associated with a securities broker-dealer where the conduct involves a violation of the securities laws, and (3) a four-level enhancement for jeopardizing the safety and soundness of a financial institution.    *See* Def. Mem. 26-28. The government agrees with part of this argument – namely, that in this instance, given that the loss figures espoused by the government include amounts relating to the failure of Rochdale and that those amounts already result in a two-level increase in the offense level, then the enhancement for jeopardizing the safety and soundness of a financial institution should not apply here.

15

To be clear, though, the inquiry on this overlapping-enhancements departure request should end there.   The Court should not grant yet a further departure because of the other two reasons identified by the defendant, namely, the loss amount and the enhancement for being in the securities industry.   These two enhancements are not, by any means, overlapping.   As the Court is well aware, the loss amount serves as the fundamental measure under the Guidelines in any fraud case.   The enhancement under U.S.S.G. § 2B1.1(b)(18)(A)(ii) applicable to professionals in the securities industry who violate the securities laws is designed to recognize the high potential for abuse in that industry and the need to enhance penalties for licensed professional who violate the securities laws.   By adding this enhancement to cover registered brokers or dealers and their associated persons, the Sentencing Commission "concluded that a four level enhancement appropriately reflects the culpability of offenders who occupy such positions and who are subject to heightened fiduciary duties imposed by securities law or commodities law similar to duties imposed on officers and directors of publicly traded corporations."   U.S.S.G. App. C, Amendment 653.   This enhancement not only takes the place of the abuse of trust enhancement in Chapter 3, but is regularly applied in securities and commodities fraud cases involving large losses to victims (and often other applicable enhancements).   *See United States v. Koch*, 2012 WL 1994704, *8 (S.D.N.Y., June 4, 2012) (applying four-level enhancement to registered representatives running a pump and dump scheme in addition to the loss enhancement, a victim enhancement, a leadership role enhancement and others, for a 78 month sentence).   There simply is no overlap between the purpose of this enhancement and the loss enhancement, and thus no departure is justified.

16

### 2. The Court Should Reject the Defendant's Claim that the Offense Level Substantially Overstates the Seriousness of the Offense.

The defendant also seeks a downward departure because, in his view, the guideline range he claims should apply – 63 to 78 months – *substantially* overstates the seriousness of the harm. Def. Mem. at 29-30.   This argument does not withstand scrutiny.   If anything, the guideline range suggested by the defendant could be characterized as understating the seriousness of the offense conduct.

In support of his argument, the defendant relies on *United States v. Adelson*, 441 F. Supp.2d 506 (S.D.N.Y. 2006), a case unlike this one.   There, the defendant had joined the securities fraud conspiracy only toward the end.   The Court found that the actual loss number of $260 million was too uncertain, and that a better measure of the loss would be $50 million pegged to the defendant's intended loss.   *Id*. at 510.   In imposing a non-Guidelines sentence, the Court also took note of the rapidly escalating guideline range as a result of numerous enhancements, including six points for more than 250 victims, another four points because the defendant was an officer of a publicly traded company, another four points for the defendant's leadership role in the conspiracy, and two points because the fraud involved sophisticated means. *Id*.

This case bears little resemblance to the circumstances in *Adelson*.   While the defendant in *Adelson* joined the conspiracy only at the tail end, Mr. Miller was front and center of this conspiracy throughout.   Moreover, the loss numbers in the *Adelson* case involved the difficult calculations that typically arise in the context of a securities fraud case involving the overstatement of publicly filed financial information by publicly traded companies.   That measure was both complicated and involved certain judgment calls.   Indeed, the opinion in

17

*Adelson* pre-dated the Second Circuit's opinion in *United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007), in which the Second Circuit held that in calculating Guidelines loss in securities fraud cases involving public companies, a sentencing court must take account of other, non-fraud factors that were responsible for the stock price to decline.   *See id*. at 178-80.

Here, a significant amount of the loss calculation, and in defendant's view the only amount, involves no guesswork or interpretation.   Instead, Rochdale lost an actual $5.3 million from its coffers as a result of having to make good on the defendant's ill-fated trade. Regardless of what arguments may be made about using loss figures as a measure of harm in cases like *Adelson*, where the question is what effect did the fraud have on the stock price of a public company, here the principal component of the loss was actual hard dollars lost by Rochdale.   Surely that is a reasonable metric of harm in a case like this.   Moreover, this case does not involve a number of the other Guidelines enhancements that *Adelson* did.   There is no victim enhancement here, nor did the scheme involve sophisticated means.   And no leadership role has been applied to the defendant.

Indeed, if anything, the guideline range could be said the under-represent the seriousness of the offense.   It bears noting that the defendant's starting point for this departure argument does not include the four-point enhancement for jeopardizing the safety and soundness of a financial institution.   Were the Court to apply that enhancement, the defendant's range, even under his loss calculation, would be 97 to 121 months.   Although both parties argue that this enhancement should not apply, the fact that the defendant's conduct led directly to the demise of Rochdale supports the notion that the sentencing range advocated by the defendant by no means overstates the seriousness of the harm.

18

The seriousness of the offense conduct is fundamentally a function of the harm caused to the victim here.   While that harm is quantified in dollar loss amounts, the reality is that the defendant is responsible for driving his employer out of business and forcing dozens of people to have to seek employment elsewhere.   As noted in greater detail herein, the seriousness of this offense cannot be overstated.   This defendant wreaked havoc on his former employer, and to claim that a guideline range of about five to six and a half years somehow overstates the seriousness of the offense is to turn a blind eye to reality.   Here, the unaudited financial statements of Rochdale for the year ending December 31, 2012 show that the trading loss alone amounted to about 28% of Rochdale's net revenues for that year.   Given the degree of the harm to the victim, the guideline range sought by the defendant plainly does not overstate the seriousness of this offense.   *See United States v. DeCecco*, 467 Fed. Appx. 85, 87-88 (2d Cir. 2012) (96-month sentence in embezzlement case based on a loss of $2.5 million did not overstate seriousness of the offense because, among other things, the fraud scheme had a "significant impact" on the victim, amounting to roughly 10% of the company's annualized revenue); *see also United States v. Canova*, 485 F.3d 674, 680 (2d Cir. 2007) (reversing departure based on loss overstating the seriousness of the offense under predecessor Guideline §2F1.1).

Accordingly, the Court should reject this argument and refuse to grant a downward departure on this basis.

### C.   The Factors in 18 U.S.C. § 3553(a) Call for a Substantial Term of Imprisonment.

Once the applicable guideline range is determined, the Court then should proceed to an analysis of the sentencing factors contained in § 3553(a).   Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply

19

with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)    the need for the sentence imposed—

        (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)    to afford adequate deterrence to criminal conduct;

        (C)    to protect the public from further crimes of the defendant; and

        (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3)    the kinds of sentences available;

    (4)    the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];

    (5)    any pertinent policy statement [issued by the Sentencing Commission];

    (6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

    (7)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The Supreme Court has distilled these considerations as follows: The sentencing court must "consider (1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) 'just punishment' (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution." *Rita v. United States*, 551 U.S. 338, 347-48

(2007).

This Court's sentence ultimately should be guided by the nature and seriousness of the offense conduct as reflected in the grave harm caused to the victim.   Such conduct displays a lack of respect for the law and the need for a just punishment.   The Court also should take into account the need for deterrence, both specific to this defendant and more broadly for those other market participants who might be inclined to engage in similar illegal trading schemes.   The Court also should consider the defendant's characteristics, and in that regard, the Court should grant the government's separate motion filed under seal and take that information into account when imposing sentence.

1. **The Nature and Seriousness of the Offense Call for a Significant Prison Sentence as a Just Punishment and in an Effort to Promote Respect for the Law.**

In fashioning an appropriate sentence, this Court should consider the nature of the offense conduct and its seriousness.   Quite simply, the offense conduct here was egregious.   The defendant participated in a conspiracy to commit wire and securities fraud in an effort to enrich himself and his co-conspirator.   Although the defendant's sentencing memorandum refers to the crime as "a one day event," Def. Mem. at 45, the scheme was ongoing for several months months, spanning at least an entire quarter.   It involved not only conspiratorial meetings, but also both an unsuccessful effort to execute it in July 2012, and an actual execution of the scheme in October 2012, with disastrous results.   Placing these events in the proper timeframe is important to show that this was not just a random act by someone experiencing a temporary break from reality.   This defendant had months to consider this plan and to think better of executing it, and he nevertheless went forward with it on October 25, 2012.   In the course of

21

executing the aims of the conspiracy, the defendant lied to numerous people and placed the creditworthiness and ultimately the safety and soundness of his employer on the line.

It would be hard to overstate the seriousness of this offense.   The defendant placed his own personal financial interests above those of his employer in an effort to line his own pockets with the proceeds of a massive trade.   If it succeeded, he would have profited and presumably been in a position to address his financial concerns.   And if it failed, he knew that Rochdale would be the one left to deal with the losses.   In the end, the plan backfired completely, and in the course of a single day, the defendant jeopardized not only his own freedom, but the livelihoods of numerous co-workers who reported to work each day for years at Rochdale.

Prior to this event, Rochdale was a relatively small brokerage firm with an established reputation on Wall Street, which employed dozens of individuals and generated millions of dollars of revenue annually.   Rochdale also was known as the home to a renowned bank analyst, and was able to generate income from his research and affiliation with the firm.   All of that came to a halt on October 25, 2012 when the defendant executed this ill-conceived scheme. The cascade of consequences led directly to Rochdale's demise.   The most basic harm caused by the defendant was the loss of almost $5.3 million by Rochdale in connection with the trade itself.   From there, things only got worse.   Pershing promptly forced the sale of collateral at below market value, leading to further losses in the millions as well as the absence of collateral to be pledged to a clearing broker for new trades.   Regulations prohibited Rochdale from trading because the scheme caused it not to be in compliance with its net capital requirements. Rochdale's traders then sought work elsewhere, as traders make money only when they trade. Then its well-known analyst, Dick Bove, decided to sever his ties with Rochdale.   Eventually,

22

when no white knight could be located to save the business, Rochdale was forced to surrender its broker's license.    All told, from the time of the defendant's ill-fated Apple trade, approximately three dozen registered representatives, traders and owners of Rochdale discontinued their association with Rochdale.

The offense is made all the more serious by the fact that it was carried out by an insider at Rochdale who was not only a licensed securities professional but had been trusted by Rochdale's management for years to engage in trading activity on behalf of the firm's clients.    The defendant abused his position in the securities industry to engage in a massive fraud for personal gain.    In the course of executing the scheme of October 25, 2012, he lied to his co-workers and supervisors by suggesting that each of the trades he made that day were authorized by the Customer, when he knew all along they were simply part of the scheme he and Trader A had concocted.    He manipulated Rochdale's systems to accomplish the execution of this massive order, and even lied to a person at the investment bank that supplied the direct electronic access to the market by telling her that the order was for a client who was covering a short position.

As if the utter devastation of Rochdale were not enough, the scheme also put at risk a completely unrelated broker-dealer with which the defendant attempted to hedge a significant portion of his massive trade.    He did this by taking advantage of a personal relationship with an individual he knew who worked at Broker #1, lying to that person repeatedly about the fact that he supposedly had a new job with Firm A and was authorized to trade on its behalf.    Based on that personal relationship, Broker #1 made the mistake of trusting the defendant and starting to execute trades in Apple stock at his request before it had confirmed his bona fides with the back office staff at Firm A.    While Broker #1 ultimately suffered no actual loss (and was able to

23

make a small profit covering the defendant's short position because of the fortuity that Apple's stock price declined), the Court should consider the risk of harm the defendant created for Broker #1.

In the end, the offense conduct is serious and must be met with a significant, just punishment.   The Court's sentence also needs to demonstrate to the defendant (and others) that they must respect the law.   The defendant, then a licensed securities broker, knew full well that this type of fraudulent conduct was illegal, and yet he went ahead and did it anyway, all in the hope of obtaining some personal financial gain.   In essence, he ignored not only his own moral compass, but subordinated the law to his own personal financial interests.   The Court should fully consider this when imposing sentence here, as promoting respect for the law is one of the principal aims of sentencing.   *See United States v. Regensberg*, 635 F. Supp.2d 306, 311 (S.D.N.Y. 2009) ("[a]ny sentence substantially out of line with that universal view [of what a right and just sentencing result should reflect] would unduly tip the scale, and not engender proper respect for the law, thus potentially undermining the integrity of the justice system").   A substantial prison sentence would help achieve that goal.

### 2.   The Court's Sentence Should Reflect the Need for Specific and General Deterrence.

Section 3553(a) also instructs sentencing courts to consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct."   18 U.S.C. § 3553(a)(2)(B). Specific deterrence of the defendant and general deterrence of others should be taken into account.   A substantial prison sentence likely would be sufficient to deter this defendant from committing further crimes down the road.   Many disgraced professionals in the defendant's situation find themselves in the midst of the criminal process for the first time in their lives, and

the collateral consequences are particularly significant.   But the only way to ensure that specific

deterrence is achieved is by imposing a sufficiently lengthy period of incarceration so as to

incapacitate the person for a period of time and convey to them that they should never repeat

their criminal conduct.   The temptation to do so, indeed, may be even greater after they are

released from prison, as they otherwise will not have their professional licenses that allowed

them to make a significant amount of money beforehand.   Knowing that a return prison awaits

if they give in to that temptation is surely likely to ward off any further criminal conduct.

The Court also should consider general deterrence in fashioning an appropriate sentence

for this defendant.   Cases involving financial crimes by corporate officials and people in the

financial industry offer a special opportunity for the Court to achieve the goal of general

deterrence.   A prison sentence for such conduct can serve as a powerful deterrent against the

commission of securities fraud and related financial crimes by licensed securities professionals.

For instance, in *United States v. Stein*, 2010 WL 678122 (E.D.N.Y., Feb. 25, 2010), Judge

Weinstein, in sentencing a defendant for violations of the securities laws, noted the importance

of general deterrence:

> Persons who commit white-collar crimes like defendant's are
> capable of calculating the costs and benefits of their illegal
> activities relative to the severity of the punishments that may be
> imposed. A serious sentence is required to discourage such crimes.
> General deterrence is satisfied with a nine-year sentence.   The
> sentence will send a clear message that any involvement in
> securities and wire fraud will result in a substantial prison
> sentence.

*Id.* at *3; *United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) (financial crimes are

"'prime candidate[s] for general deterrence'") (quotation omitted); *see also United States v. Ture*,

450 F.3d 352, 358 (8th Cir. 2006) (in tax evasion cases, district courts are required "to consider

the importance of a term of imprisonment to deter others from stealing from the national purse").

In contrast, a sentence that does not include a substantial period of imprisonment would send the

wrong message.

In the context of white-collar criminal prosecutions, the imposition of prison sentences

does work to provide general deterrence to others.   The author of a survey of academic research

regarding the efficacy of criminal sanctions for white-collar crimes summed up the issue well in

the following passage:

> White-collar crime is believed to be particularly amenable to
> deterrence due to its rational and profit-oriented motivation.   In a
> conceptual analysis of the topic, Braithwaite and Geis observed
> that white-collar offenders are not committed to a lifestyle of
> illegality, are risk aversive, and have more to lose as a result of a
> criminal conviction than street offenders.   Elsewhere Geis noted
> that "[j]ail terms have a self-evident deterrent impact upon
> corporate officials, who belong to a social group that is exquisitely
> sensitive to status deprivation and censure." It is generally
> perceived that executives exhibit distress at the thought of being
> sentenced to incarceration: "It results in hypertension, it causes
> heart attacks, it is very serious."
>
> Most judges and prosecutors view general deterrence as the one of
> the goals, if not the major purpose, in sentencing white-collar
> offenders. Punishment should serve to discourage others from
> committing similar offenses and jail or prison sentences, judges
> and scholars alike tend to believe, are particularly effective as a
> general deterrent.

Elizabeth Szockyj, "Imprisoning White-Collar Criminals?", from "Symposium: A Fork in the

Road Build More Prisons or Develop New Strategies to Deal with Offenders," 23 S.Ill.U.L.J.

485, 492 (1999) (footnotes omitted).

These observations are especially compelling in a case such as this.   Thousands of

licensed professionals in the securities industry have the same access to execute trades through

their employers as the defendant did.   The vast majority of them play by the rules.   But those who might consider participating in a scheme such as this one ought to know that their conduct will be met with swift and significant punishment.

### 3.   The History and Characteristics of the Defendant.

Section 3553(a) also requires the Court to consider the history and characteristics of the defendant in fashioning an appropriate sentence.   The PSR goes into great detail about the defendant's background, all of which should be considered by the Court.   The Court also should take into account the government's separately filed sealed motion and memorandum in this regard.

One thing for the Court to keep in mind when reviewing all of this personal evidence is the fact that there really is no legitimate reason for the defendant to have committed these offenses.   The PSR makes clear that he has had the support of family and friends his whole life. His sentencing memorandum and exhibits further show that he has a lot of loved ones and supporters in his corner.   He had the good fortune to attended college and become licensed in the securities industry, holding Series 7 and 63 licenses.   PSR ¶ 52.   He also maintained a series of jobs in the securities industry where he made good money, as reflected in the adjusted gross income reported on his tax returns.   PSR ¶ 58.   In short, the defendant had advantages and opportunities that many defendants who come before this Court never had, and yet he still proceeded with this plan to line his own pockets.   While he suggests that the reason for pursuing this fraud scheme was that his personal financial situation was becoming more and more tenuous, a situation exacerbated by his reduced level of commissions at his job, it also appears to have been a problem of his own creation, with several large losses in the stock market

27

over the years.    PSR ¶¶ 17, 43.    But his offense conduct clearly was not the only way out of his financial troubles.    Nor is the fact that he not the type of person to ask for help a valid excuse for his conduct.    Def. Mem. 47.    This Court's sentence should discourage those who are feeling the pinch of tighter economic times from resorting to fraud.

Many of the defendant's arguments call to mind the recitation of the typical appeals for leniency made by white collar defendants as identified at length in *United States v. Regensberg*, 635 F. Supp.2d 306, 308-11 (S.D.N.Y. 2009).    In addressing these common pleas for mercy, which rely heavily on a defendant's good works, family values and purportedly aberrational conduct, as well as medical and psychological evaluations, the district court in *Regensberg* noted the following:

> Let me stress at this point that the Court is not unmindful or unsympathetic to these points. There is much in [the defendant's] plea to commend the compassion it seeks to evoke. But the argument goes only so far. Compelling as it sounds on the surface, it fails in essential ways. Fundamentally, it is flawed by what it omits. In particular, it makes no account of several other circumstances courts are instructed to weigh adequately in ordering a fitting sentence: to reflect the severity of the crime; to promote general respect for the law; to avoid unwarranted sentencing disparities; and to consider the impact of the crime not only on its immediate victims, but on the larger social order. These principles are interrelated. They share vital links with some basic legal and philosophical concepts, ideals emblematic of the law profoundly significant for sentencing to ensure a right and just result for all concerned: fairness, balance, proportionality, and equality of treatment under law for relatively similar persons and circumstances. In sentencing, these principles seek to ensure that judgments overall fairly align so as to achieve, like planets in orbit, a special form of equilibrium, a proper balance in the delicate symmetry of justice.

*Id*. at 308-09.

This Court should keep in mind that the tried and true arguments made by defendants in white collar cases, which are set forth with great care and detail in the defendant's submission, tend to avoid the more difficult aims of sentencing that Congress has instructed all sentencing courts to consider when fashioning an appropriate sentence.   While this Court should consider all of the information supplied by the defendant, that information should be appropriately balanced against the need for the Court to punish the defendant for his conduct and to build respect for the law while deterring further criminal conduct.   Those and the other goals of sentencing are satisfied here only by a substantial term of imprisonment.   Regardless of the support the defendant has from his family and friends, and despite the financial pressures he was feeling at the time, the fact remains that a person in that situation who is a licensed professional in the securities industry may not engage in fraud on a massive scale, bring down an entire company, and expect great leniency by seeking to show that he is otherwise a decent person. This Court should recognize that the defendant has done the right things since committing the offense.   But fundamentally, the focus of this sentencing, like all, is about punishing the defendant for the upheaval he caused in the lives of Rochdale's owners and employees, and discouraging him and others from ever doing the same thing.   Only then will the sentence truly build respect for the law.[3]

---

[3] The defendant references several other cases of rogue trading in his sentencing memorandum and claims that they justify a lower sentence for the defendant because of §3553(a)'s provision instructing sentencing courts of the need to avoid unwarranted sentencing disparities among similarly situated defendants.  *See* Def. Mem. 61-65. Much of the defendant's focus is on the actual losses incurred in those cases – somewhat inconsistent with his earlier arguments criticizing the Guidelines use of loss as a metric in sentencing.   But more to the point, those cases did not involve the extent of the devastation to the employers of the rogue traders that this one did.   This defendant drove his employer out of business.   None of the traders referenced in the defendant's memorandum did the same.   For that reason alone, they are not similarly situated.

29

**II.     The Mandatory Victim Restitution Act Requires that the Court Enter
         an Order of Restitution.**

In addition to any sentence of imprisonment, the Court is required to order restitution.

*See* 18 U.S.C. § 3663A.   The Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C.

§§ 3663A and 3664, applies to "an offense against property under this title   . . . including any

offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii).    Under the MVRA, a

district court must order restitution in such a case where "an identifiable victim or victims has

suffered a . . . pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B); *see United States v. Battista*, 575

F.3d 226, 230 (2d Cir. 2009).   This Court is required to impose an order of restitution in this

case in favor of the victims for the full amount of their losses, without consideration of the

defendant's ability to pay that amount.    18 U.S.C. § 3664(f)(1)(A) ("In each order of restitution,

the court shall order restitution to each victim in the full amount of each victim's losses as

determined by the court and without consideration of the economic circumstances of the

defendant."); *see Battista*, 575 F.3d at 230; *United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir.

2004); *United States v. Johnson*, 378 F.3d 230, 244-45 (2d Cir. 2004); *see also* U.S.S.G. § 5E1.1

(directing the sentencing court to enter a restitution order if there is an identifiable victim).

Loss for restitution purposes consists of a victim's actual loss.    *See United States v.*

*Germosen*, 139 F.3d 120, 130 (2d Cir. 1998).   In examining the MVRA, the Second Circuit has

written:

> Because the MVRA mandates that restitution be ordered to crime
> victims for the "full amount" of losses caused by a defendant's
> criminal conduct, it can fairly be said that the "primary and
> overarching" purpose of the MVRA "is to make victims of crime
> whole, to fully compensate these victims for their losses and to
> restore these victims to their original state of well-being."

*United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006) (citations and quotations omitted).

The MVRA provides that a victim also may recover "lost income . . . and other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings relating to the offense."   18 U.S.C.§ 3663A(b)(4).   The Second Circuit has upheld a $12.8 million restitution award where a corporation was the victim of a mail and wire fraud scheme, holding that expenses "incurred during the victim's participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense may include attorney fees and accounting costs."   *United States v. Amato*, 540 F.3d 153, 159 (2d Cir. 2008); *see Battista*, 573 F.3d at 233-34 (allowing restitution of attorneys' fees incurred by the NBA in connection with the investigation and prosecution of conspiracy involving one of its referees under the nearly identical language of the Victim Witness Protection Act ).

Here, the Court should enter an order for the full amount of restitution to Rochdale. Given the inherent difficulty in pinpointing precise loss numbers regarding the business valuation, the government would suggest a restitution figure of no less than the trading losses be entered.   Should the victim wish to pursue restitution for the additional sums, the government will promptly alert the Court and ask for a hearing within the time limits established by the MVRA.

## CONCLUSION

The government requests that the Court consider all the submissions and evidence in this case in light of the fundamental aims of sentencing and impose a substantial term of imprisonment.   The government leaves the specific length of that sentence to the Court's considerable discretion.

Respectfully submitted,

DEIRDRE M. DALY
ACTING UNITED STATES ATTORNEY


/S/ *Paul A. Murphy*
PAUL A. MURPHY
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct26654
United States Attorney's Office
1000 Lafayette Blvd., 10th Floor
Bridgeport, Connecticut 06604
(203) 696-3000

## <u>CERTIFICATION</u>

I hereby certify that on November 15, 2013, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.   Notice of this filing will be sent by e-mail to all parties by operation of the Court electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court CM/ECF.


*/S/ Paul A. Murphy*
PAUL A. MURPHY
ASSISTANT U.S. ATTORNEY